COURT OF APPEALS OF VIRGINIA


Present:  Judges Bray, Frank and Humphreys
Argued at Chesapeake, Virginia


FREDERICK SMALLWOOD, S/K/A
 FREDERICK B. SMALLWOOD
                                           OPINION BY
v.    Record No. 1970-00-1          JUDGE ROBERT P. FRANK
                                         OCTOBER 9, 2001
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
                     Wilford Taylor, Jr., Judge

            W. Todd Watson (David B. Hargett; Hargett &
            Watson, on brief), for appellant.

            Paul C. Galanides, Assistant Attorney General
            (Mark L. Earley, Attorney General; Thomas M.
            McKenna, Assistant Attorney General, on
            brief), for appellee.


     Frederick B. Smallwood (appellant) was convicted after a

jury trial of the murder of Debra Smallwood (Debra), in

violation of Code § 18.2-32, and use of a firearm during the

commission of that murder, in violation of Code § 18.2-53.1.  He

contends on appeal that the trial court erred in 1) declaring a

Commonwealth's witness adverse and permitting the Commonwealth

to impeach that witness and 2) admitting into evidence the

decedent's change of beneficiary form.  For the following

reasons, we reverse these convictions.

## I.   BACKGROUND

This Court reversed and remanded appellant's initial convictions of murder and use of a firearm.  Smallwood v. Commonwealth, No. 1616-96-1 (Va. Ct. App. Feb. 17, 1998).  On retrial, the evidence proved the following facts.

The police were called to the Smallwoods' home in the City of Hampton on the afternoon of August 31, 1995.  When they arrived, appellant told Officer John Proctor that he was arguing with a "friend" when she pulled out a gun, placed it against her head, and pulled the trigger.  The officer went into the house and found Debra Smallwood dead on the floor of an upstairs bedroom with a gun lying between her legs.

Another officer began talking to appellant, questioning him about events that afternoon.  Appellant said his wife had come home from Kecoughtan High School where she taught, and they were discussing some confusion over luncheon plans.  The gun was "sitting there," according to appellant, and his wife "just grabbed it, and bang."

Later, appellant was taken to the police station for further questioning.  He made another statement, saying he and Debra were arguing about his desire to find a ministry in Florida, when she picked up the gun and shot herself.

Eventually, appellant was arrested.  He then claimed that the gun went off during a struggle with his wife.

At trial, the Commonwealth introduced evidence that appellant had continued his close friendships with at least two women after he married Debra. During the Commonwealth's direct examination of one of these women, Linda Norton (Norton), the prosecutor asked, "[D]id you have any knowledge about the marriage between the defendant and Debra Smallwood?" Norton responded, "No, I did not. No, I did not."

The Commonwealth then asked the court "to declare that Ms. Norton is an adverse witness of the Commonwealth, because of her statement that she made regarding her knowledge of the marriage of the defendant and the victim."

The trial court ruled the witness proved adverse and "they [could] impeach their own witness." The trial court instructed the jury at the end of the examination and again with the general instructions that a witness' prior statements were not evidence of facts but only evidence affecting the credibility of the witness.

An employee of the Hampton City Schools' payroll and finance office also testified, over appellant's objection. She explained she had received a form from Debra a week prior to the killing, requesting a change of beneficiary for her life insurance policy. The form was signed by Debra but not notarized, so the beneficiary was never changed to appellant as the form requested.

The form was introduced into evidence over appellant's objection.

## II.  ANALYSIS

Appellant contends the trial court erred in allowing the Commonwealth to impeach Norton and in admitting evidence of the change of beneficiary form.

This Court reviews a trial court's evidentiary rulings for abuse of discretion in admitting the evidence.  Quinones v. Commonwealth, 35 Va. App. 634, 639, 547 S.E.2d 524, 527 (2001).

### A.

Generally, a party cannot call a witness simply to impeach her.  Maxey v. Commonwealth, 26 Va. App. 514, 521, 495 S.E.2d 536, 540 (1998).  In such a case, no evidence relevant to the proceeding would be introduced -- the jury simply would hear the person was not a credible witness, without hearing any substantive information on which they must decide the issue of credibility.

Here, however, the Commonwealth had a legitimate reason for calling Norton to the stand.  The prosecutor asked her questions regarding her relationship with appellant that were relevant to motive.  She testified they were "best friends" and that she gave him money on several occasions.  This relationship continued after appellant married the decedent.  Norton also testified she contacted him, not at his home with Debra but at the home of "Mrs. Knuckles."  All of this testimony was relevant

to the relationship between appellant and his wife as well as a possible motive for murder. The Commonwealth properly called Norton during the case-in-chief as she provided information relevant to the charges.

Norton was not called as an "adverse witness" under Code § 8.01-401,[1] despite her friendship with appellant. Whitehead v. Commonwealth, 31 Va. App. 311, 316-17, 522 S.E.2d 904, 906-07 (2000). After Norton began testifying, however, the Commonwealth asked the trial court "to declare Ms. Norton is an adverse witness," pointing to "her statement that she made [on direct examination] regarding her knowledge of the marriage of the defendant and the victim. I have a good faith belief that that statement is not true." The prosecutor also argued:

> [H]er testimony and her statement that she did not know about the marriage is injurious to the Commonwealth's case, because of her prior statements that were made which go to definitively to the Commonwealth's idea of motive in this case, the defendant trying to get the victim's money.
>
> *    *    *    *    *    *    *
>
> Her prior statements were that she had discussed with the defendant for three months in advance of his marriage to Debra in order to get Debra's money, that he would then divorce Debra and marry her.

---

[1] Code § 8.01-401(A) states: "A party called to testify for another, having an adverse interest, may be examined by such other party according to the rules applicable to cross-examination."

Clearly, although the Commonwealth used the term, "adverse witness," the prosecutor actually asked the trial court to find Norton had provided adverse testimony and to allow the Commonwealth to impeach its own witness.  The prosecutor never asked for permission to use leading questions during her direct examination of Norton.

The trial court ruled "the witness has proved adverse" and, apparently referring to Code § 8.01-403,[2] which allows the impeachment of a party's own witness under certain circumstances, explained how further examination of the witness would proceed.  The Commonwealth then began to impeach Norton.

"Adverse witness" is not synonymous with "adverse testimony."  Whitehead, 31 Va. App. at 317, 522 S.E.2d at 907. Norton could be asked leading questions if she was an adverse

_____

[2] Code § 8.01-403 states:

> A party producing a witness shall not be allowed to impeach his credit by general evidence of bad character, but he may, in case the witness shall in the opinion of the court prove adverse, by leave of the court, prove that he has made at other times a statement inconsistent with his present testimony; but before such last mentioned proof can be given the circumstances of the supposed statement, sufficient to designate the particular occasion, must be mentioned to the witness, and he must be asked whether or not he has made such statement.  In every such case the court, if requested by either party, shall instruct the jury not to consider the evidence of such inconsistent statements, except for the purpose of contradicting the witness.

witness, but she could be impeached by a prior inconsistent statement only when her testimony "prove[d] adverse." Code § 8.01-403.

The Supreme Court has explained:

> [O]ne is not permitted to impeach his own witness merely because the latter does not come up to his expectation. It is only when the testimony of the witness is injurious or damaging to the case of the party introducing him that the witness can be said to be adverse so as to justify his impeachment. If the testimony is of a negative character and has no probative value, there is no need to discredit the witness.

Virginia Electric and Power Co. v. Hall, 184 Va. 102, 105-06, 34 S.E.2d 382, 383 (1945).

For example, in Brown v. Commonwealth, this Court found the trial court erred in allowing the Commonwealth to impeach its witness when he changed his testimony, claiming on the stand that he did not see the stabbing and did not know the parties. 6 Va. App. 82, 86, 366 S.E.2d 716, 719 (1988). This testimony, although contradicting the witness' previous statement to the police, "had no probative value [as it] could not have assisted the trier of fact in determining Brown's guilt or innocence." Id. The testimony given by the witness did not prove or disprove Brown's guilt; instead, it added nothing to a description of the events. See also Ragland v. Commonwealth, 16 Va. App. 913, 920-21, 434 S.E.2d 675, 680 (1993).

Norton's testimony that she did not know about appellant's marriage to Debra in no way damaged or injured the Commonwealth's case, nor did it help the case. The appellant and the decedent were married; no one disputed that fact. Norton simply claimed she did not know they had married. This testimony had no probative value for the issue of whether appellant, who knew he was married, murdered his wife. The Commonwealth's case was not damaged by this testimony, although the prosecutor's expectation was disappointed. The trial court erred when it allowed the Commonwealth to impeach Norton.

When a trial court errs in allowing the presentation of evidence to the jury, this Court must decide whether that error was harmless. As this issue involves non-constitutional error, if appellant "had a fair trial on the merits and substantial justice has been reached," his convictions will not be reversed. Code § 8.01-678. The Commonwealth has the burden "to prove that the error was non-prejudicial." Beverly v. Commonwealth, 12 Va. App. 160, 163-64, 403 S.E.2d 175, 177 (1991).

Norton denied having "any knowledge about the marriage between the defendant and Debra Smallwood." The trial court then ruled her testimony had proved adverse and allowed the Commonwealth to impeach her with a prior statement.

The Commonwealth asked Norton about her statement to the police in which she said appellant planned to "marry Debra so that he would have more money to live on, that after he married

Debra and after he had gotten a church, that he would then divorce her and [Norton] could be married to him."

The following exchange then took place between the prosecutor and Norton:

> Q.  So, ma'am, you told them that you suggested [appellant] marry the victim for her money?
>
> A.  Because that's what they wanted to hear.
>
> Q.  Ma'am, do you also recall telling the detectives that you thought [appellant] was going to divorce Debra?
>
> A.  No, I don't remember saying that.
>
> Q.  Do you remember telling them again that you thought [appellant] was going to marry her, referring to Debra, and get the money from her.
>
> A.  I do not remember saying that.
>
> Q.  Do you remember saying that [appellant] was going to get at least forty thousand dollars from Debra?
>
> A.  No.  How would I know what amount, if any?
>
> Q.  Do you remember telling the detectives forty thousand because that's what you owed in your credit cards and your loans?
>
> A.  I have no idea what I owe on my credit cards or loans.
>
> Q.  Do you recall telling the detectives that you didn't believe that [appellant] would actually marry Debra Smith, but in your heart you knew he would, but you didn't want to believe it, that that would have been the only way he would have been able to get enough money to pay you back, and that hopefully you would get a church, that he

would divorce her, and then you would be together?

A.  I have no idea.  I don't remember.  All I remember was being threatened by them.

Q.  Do you remember telling the detectives again, "So [appellant] was to marry Debra, correct?" And your response was, "Correct"?

A.  I don't remember.

Q.  And do you remember the question, "And marrying Debra because she had what?"  And you responded, "Money"?

A.  No, I don't remember.

Q.  Do you recall saying, "The money that you needed to do what?"  And your response was, to clear up your debts and help him survive financially?

A.  No, but I do remember after making a tape I called Detective Seals the next day –

     *     *     *     *     *     *     *

Q.  Do you recall telling Detective Seals and Detective Meadows that, "Once Debra and [appellant] were married that he would do what?"  And you told them that he would get a church, and after the marriage occurred and he got his church, and he was set up financially, you were asked, What was he going to do?  And your response was, I thought he was going to get a divorce.  Do you recall saying that?

A.  No, I don't recall saying that.

Q.  Do you recall telling the detectives that you assumed that he was getting a divorce so he could be with you?

A.  No.

Q.  Do you recall telling Detective Seals and Detective Meadows that you had discussed

the entire situation with [appellant], that he was going to get a divorce from Debra Smallwood once married, and set up his church, and that then you would marry him and your debts would be paid off?

A. No. How would I know what he's going to do?

Q. Do you recall telling Detective Seals and Detective Meadows that you and [appellant] had discussed over the telephone three months prior that he was to be with Ms. Smith and should marry Ms. Smith?

A. No, I don't remember that.

Q. Do you also recall telling the detectives that you discussed over the phone [appellant] was to marry Ms. Smith so that he could get a church in Virginia; is that right?

A. I know he was looking for a church in Virginia, but I didn't know he was going to marry Debra.

Q. Do you recall your response when the detectives asked you, "She," referring to Debra, "had the money that was needed by [appellant] to repay your debts so that you would be financially stable again, correct?" And your response was, "Correct"?

A. I don't know if she had any money or not.

 *     *     *     *     *     *     *

Q. And do you recall telling the detectives that the money part didn't bother you as much, but that you were willing to let him marry somebody else so that you could eventually be together?

A. No, I don't remember.

Finally, the Commonwealth asked, "Ma'am, you previously testified just today that you had no knowledge about this marriage between [appellant] and the victim in this case; is that right?"  Norton responded, "That's correct.  I did not know when they got married, or if in fact they had been married."

The Commonwealth never called the detectives to testify about Norton's statements to them nor was a transcript of their interview introduced into evidence.

None of the questions that the Commonwealth asked Norton impeached her testimony that she did not know appellant and Debra had married.  Although the Commonwealth asked numerous times about her prior statement to the police, nothing in that statement suggested she knew they actually had married.  In addition, the Commonwealth never asked Norton what she and appellant had discussed about the marriage; the prosecutor only asked whether she had made particular statements to the police.

While the examination at issue did not impeach Norton, the form of the questions exposed the jury to highly prejudicial, hearsay statements allegedly made to the police.  Although the trial court told appellant, "I will instruct the jury as the Code also requires that they are not to consider the evidence as [sic] such inconsistent statements except for the purpose of contradicting the witness," this instruction was not given until the end of the Commonwealth's examination of Norton.

Although a jury is presumed to follow the court's instructions, in this situation, where the questioning was continuous, lengthy, and highly prejudicial, instructing the jury at the end of the examination and before deliberation does not provide enough protection to appellant. LeVasseur v. Commonwealth, 225 Va. 564, 589, 304 S.E.2d 644, 657 (1983). We cannot say this error did not affect the jury's verdict, especially as the questions did not actually impeach the witness. See Lavinder v. Commonwealth, 12 Va. App. 1003, 1005, 407 S.E.2d 910, 911 (1991) (en banc).

B.

Appellant also argues the trial court erred in allowing the Commonwealth to introduce irrelevant hearsay evidence of Debra's intent to change her life insurance beneficiary. The Commonwealth argues that the evidence was not hearsay. Assuming without deciding that the evidence was not hearsay, we find the trial court erred in admitting this document because its relevance was not established.

In response to appellant's argument that knowledge of the change of beneficiary was not "linked to this defendant," the Commonwealth explained that the evidence was "absolutely admissible because it goes to demonstrate motive." The trial court found the evidence was offered to establish motive and was admissible. The Commonwealth has never suggested the evidence was relevant to any other issue in this case.

The Supreme Court has explained when evidence of motive may be introduced:

> [W]here the motive of a party is a material inquiry in a cause, whether civil or criminal, any evidence which tends in any degree to throw light upon that question is admissible. But before a fact or circumstance is admissible in evidence against a party to show motive, such fact or circumstance must be shown to have probably been known to him; otherwise, it could not have influenced him. For a man cannot be influenced or moved to act by a fact or circumstance of which he is ignorant.

Mullins v. Commonwealth, 113 Va. 787, 789-90, 75 S.E. 193, 195 (1912) (citations omitted).

The Commonwealth argues, because Debra and appellant were married, knowledge of the policy can be imputed to appellant. However, the case law does not support this presumption.

No Virginia cases directly address this issue. The Commonwealth cites Mullis v. Commonwealth, 3 Va. App. 564, 351 S.E.2d 919 (1987), but this case is not relevant to the facts here. Mullis testified and was asked whether she knew about the decedent's life insurance policy naming her as beneficiary. Id. at 574, 351 S.E.2d at 925. This question was relevant to Mullis's bias and credibility as a witness, as well as to whether she had a motive for murder. The jury could believe her testimony or not.

Here, the record contains no evidence that appellant ever confirmed or denied the existence of the policy. He never

mentioned an insurance policy in his statements to police, and he did not testify at trial. He did not try to collect any money from the insurance company, and no witness came forward to suggest appellant knew Debra was making him the beneficiary.

Other states have held that prosecutors must establish a defendant probably knew about a spouse's insurance policy prior to presenting this type of evidence to the jury. See, e.g., People v. Coleman, 276 N.E.2d 721, 724 (Ill. 1971); State v. Leuch, 88 P.2d 440, 442-43 (Wash. 1939). This rule conforms to the general rule that to introduce evidence of motive, some foundation must be laid to establish the defendant knew about the circumstance.

While the Commonwealth did not need to prove beyond a reasonable doubt that appellant knew he was the beneficiary, some evidence of his knowledge needed to be offered to the trial court before allowing the jury to hear about the change of beneficiary. See Robinson v. Commonwealth, 228 Va. 554, 558, 322 S.E.2d 841, 843 (1984) (acknowledging the test established in Mullins).

Here, no evidence suggested appellant knew about the policy. The fact that he was her husband is not enough by itself to establish relevance. The Commonwealth produced no evidence, direct or circumstantial, to establish appellant knew about the proposed change. Although Debra submitted the form less than a week prior to the murder, that circumstance allows

only for idle speculation that appellant knew about the submission.

While motive is a relevant issue, knowledge of the change of beneficiary attempt by the decedent was not attributable to appellant.  A proper foundation for the introduction of the evidence was not laid -- nothing indicates appellant had any knowledge of the policy change prior to the killing.

We cannot say this error was harmless.  The entire case rested on appellant's alleged financial motive for killing his wife.  The only direct evidence that he would receive any money from her death was the insurance policy.  Clearly, allowing the jury to hear about that policy was not harmless error.

For the reasons stated, we reverse the convictions and remand for a new trial, if the Commonwealth be so inclined.

<u>Reversed and remanded.</u>