STATE of Minnesota, Respondent,

v.

Thanh Quan TRAN, Appellant.

No. A05–26.

Supreme Court of Minnesota.

April 20, 2006.

Office of the State Public Defender, Rochelle R. Winn, Ass't State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Minnesota Attorney General, St. Paul, MN, James Backstrom, Dakota County Attorney, Scott A. Hersey, Assistant Dakota County Attorney, Hastings, MN, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

A Dakota County jury found appellant Thanh Tran guilty of first-degree premedi-

tated murder and second-degree intentional murder for the shooting death of Dao Xiong. The district court convicted Tran of first-degree premeditated murder and sentenced him to life in prison. On appeal, Tran alleges that the court erred when it admitted evidence of the existence of a large insurance policy on the victim's life and of the financial difficulties and gambling habits of the victim's wife. Tran asserts that the court erred in admitting this evidence because there was no evidence that he knew the life insurance policy existed or had a reasonable expectation of benefiting from it. Additionally, Tran claims the court erred when it prevented defense counsel from eliciting testimony that a possible alternative suspect was a gang member. We affirm.

On December 18, 2003, at approximately 5:30 p.m., Dao Xiong was entering his Inver Grove Heights home when he was shot three times. The first shot went through Dao Xiong's hand; the second shot was to his head. Following the second shot, the perpetrator placed a pillow over Dao Xiong's head as he lay on the floor, and fired a third shot to the back of the head through the pillow. Dao Xiong died immediately after the second shot to the head.

Dao Xiong's wife, Laura Xiong, arrived home at approximately 6:30 p.m. with the couple's three children, who were approximately 2, 8, and 10 years old, and three of Laura Xiong's nieces, T.L., M.L., age 16, and C.L., age 18. Laura Xiong and the children discovered Dao Xiong's body about ten feet inside the door from the attached garage. M.L. checked to see if Dao Xiong had a pulse and found none. Laura Xiong told M.L. and C.L. to go upstairs to see if anything was taken from the home. M.L. and C.L. obeyed, but could see little because it was dark; nevertheless, M.L. was able to observe that the bookshelves appeared to be "shoved down." When the two nieces returned to the scene of the homicide, Laura Xiong called 911 at M.L.'s request.

When the police arrived, they noted that, while M.L. and C.L. were quite upset, Laura Xiong appeared to be "very controlled" and generally emotionless. On walking through the home, the police saw that some things appeared to be stolen; there were, for example, conspicuous spaces where items appeared to have been removed, and a gun safe was open and empty. But the police also noted that there was little evidence that the intruder(s) had rummaged around the home, and the police observed that several things that normally would have been taken during a burglary were not. In addition to the attached garage door, the Xiongs' home had an exterior basement entrance, which had both a regular wooden door and a storm door. The police noted that the window on the exterior basement entry wooden door was broken, and that broken glass lay on the floor on the inside of the house. The police also found blood on the storm door, and they took a sample of the blood for DNA testing.

Upon inquiry, Laura Xiong indicated that several things were missing from the home, including two PlayStations, a desktop computer, a laptop computer, a Samsung VCR/DVD player, a JVC video camera, a Kodak digital camera, two Game Boys, some jewelry, a quantity of cash, and a number of firearms. The firearms included a Taurus PT–111 9mm, a Ruger 10/22, a Browning, a youth Lever .22, and a Benelli shotgun. A gun scope was also reported stolen. Laura Xiong provided serial numbers for the video camera, the DVD/VCR, the stolen firearms, and one of the PlayStations. Laura and Dao Xiong's children helped in compiling an additional list of stolen PlayStation games and DVDs,

some of which had been rented from a video store.

During the course of their investigation, the police learned several facts which caused them to suspect that the thefts were staged and the murder was planned. Upon subpoenaing Laura and Dao Xiong's cell phone records, the police noticed that a certain number appeared frequently, sometimes as often as 10 and 25 times per day, on Laura Xiong's cell phone records. This number was assigned to a cell phone owned by Tran. The police contacted Tran and brought him to the police station for questioning on January 14, 2004. During this interview, Tran indicated that he and Laura Xiong were platonic friends who knew each other through a gambling establishment at Canterbury Park. At this police interview, Tran gave the police a DNA sample. Upon conducting a DNA analysis, the police concluded that the blood found on the storm door of Dao and Laura Xiong's home was Tran's. On January 22, 2004, a week after being questioned by the police, Tran had his Ford Explorer detailed.[1] Soon after being questioned by the police, Tran began driving the car that Dao Xiong drove before his death.

Laura Xiong also initially claimed that she and Tran were only friends. But in addition to the numerous telephone calls between Laura Xiong and Tran, the police discovered that Laura Xiong and Tran had spent several nights together at hotels. Also, some of Laura Xiong's and Tran's friends and acquaintances informed the police that the two were in a romantic relationship. Laura Xiong eventually admitted that she and Tran were involved in an ongoing sexual relationship and that Tran had told her several times that he loved her.

Telephone records and witness testimony revealed that around December 1, 2003, Tran had given Laura Xiong a cell phone, which police believed was used to carry on their affair and possibly to arrange Dao's murder. Laura Xiong denied having received such a phone from Tran. However, the large volume of calls between the cell phone registered to Laura Xiong and Tran's cell phone ceased abruptly after December 1, 2003. Instead, a similarly large volume of calls began between Tran's first cell phone and a second cell phone which was registered to Tran. Cell phone records also indicated that someone using this second cell phone frequently called from the area of Laura Xiong's workplace, and that calls from that phone and location were made to Laura Xiong's relatives and friends in addition to Tran, indicating that Laura Xiong was using this second cell phone. After the murder, Tran gave the second cell phone to an acquaintance. Police determined by the nature of the incoming and outgoing calls that Tran's first cell phone was in his possession at the time of the murder.

The police also discovered that Laura Xiong had financial difficulties. Laura and Dao Xiong had declared bankruptcy in 1998. At the time of the murder, Dao earned over $100,000 per year as a trucker and Laura Xiong earned an additional $40,000 per year as an office manager for a local painting company, but, despite their substantial combined income, they owed over $72,000 in federal taxes, another $60,000 in credit card debt, and had assorted smaller debts of under $10,000 each. The mortgage payment on the couple's home was $2,700 per month, and they had the expense of raising three children.

1. "Detailing" is a technical term which refers to a thorough, expert cleaning of both the inside and outside of a car. It is generally significantly more expensive and extensive than a typical car cleaning.

Laura and Dao Xiong were each covered for $850,000 in life insurance and paid approximately $500 per month for life insurance premiums. In addition, the police learned that Laura Xiong was a habitual gambler who lost approximately $5,000 per month at gambling establishments—particularly Canterbury Park.

The police also discovered that Tran had severe financial difficulties. At the time of the murder, Tran was unemployed, the title to the car he was driving was in his ex-girlfriend's name,[2] he was living with friends—generally for free—and he had persuaded two ex-girlfriends to give him a total of $19,000. Tran also owed $13,500 to his ex-wife, and he gambled heavily.

Upon further investigation, the police discovered that Tran had had possession of nearly all of the items taken from the Xiong home and had distributed those items to various friends. First, the police searched the apartment of a friend of Tran's where Tran had been living. The friend told the police that sometime between the 15th and 20th of December 2003, she noticed that Tran had moved a "pile of stuff" into the apartment and had placed a blanket over it. Tran told the friend that he had bought the objects from "some Hmong people." One day when Tran was absent, the friend looked under the blanket, opened a zippered bag underneath it, and saw three guns inside the bag, one of which was a "long gun" with a gun scope on it. She then told Tran to remove the guns from the apartment. Later, Tran told the friend that he had thrown the guns into the river.

Tran's friend also saw him moving a desktop computer into the apartment. The friend also noted that Tran had moved a PlayStation and possibly a laptop computer into the apartment. Tran subsequently gave the desktop computer to another friend. Upon examination of this desktop computer, the police discovered that it was the one that Laura Xiong had reported stolen.

Following up on several leads, the police recovered the Xiongs' camcorder, laptop, VCR/DVD player, digital camera, one of the missing PlayStations, and a number of the missing DVDs from another of Tran's acquaintances, who told the police that Tran had given him the items. He said Tran had told him the items were "old" and that Tran wanted to "get rid of" them. The serial numbers on all the items recovered matched those provided by Laura Xiong, pictures of the Xiong children and family outings were found on the cameras, and the police found the remote control for the VCR/DVD player at the friend's apartment where Tran had been staying. An assistant manager from a movie rental store confirmed that several of the DVDs were those that had been rented by the Xiongs and that Laura Xiong had reported stolen. Additionally, Tran's ex-wife reported that Tran had given his children a PlayStation; while this PlayStation did not have a serial number, it was of the type that Laura Xiong had reported stolen. The record does not indicate that any of the items were insured or that any insurance was claimed for any of the items.

Using the cell phone records and admissions made by Laura Xiong at a subsequent interview, the police ascertained that Tran was present at the Xiong home on the day of Dao Xiong's murder and was in the neighborhood all that afternoon. At trial, Laura Xiong admitted that she and Tran had met at the Xiong home to have

---

**2.** The ex-girlfriend testified that the car was purchased in her name because Tran had bad credit, but Tran was supposed to make the car payments. For a time, he did make the payments, but he stopped around January 2004 and returned the car to his ex-girlfriend.

sex on the afternoon of December 18, 2003. Laura Xiong testified that she left the home at approximately 1:10 p.m. and arrived back at work at about 1:45 p.m. While Laura Xiong claimed that Tran left the home before she did, cell phone records indicate that Tran made and received several calls via his first cell phone between 3:00 and 5:00 p.m., accessing the cell phone tower closest to the Xiongs' home.[3] At about 5:15–5:20 that evening, Laura Xiong called her husband. She testified that he told her he was on his way home to switch his semi-truck for his car and then would go immediately to pick up their son and take him to karate class. Immediately after that call ended, at 5:25 p.m., cell phone records indicate that someone using the second cell phone, which evidence showed was in Laura Xiong's possession, placed a call to Tran which lasted only one minute.

Based on the collected evidence, the police arrested Tran and charged him with second-degree murder. Tran subsequently was indicted for first-degree premeditated murder and first-degree murder committed during a burglary. The state argued at trial that Tran had moved the "stolen" objects into his Ford Explorer during the afternoon of the murder, shot Dao Xiong when he returned home, and only after the murder did Tran break the window on the exterior basement entry wooden door to make it appear that the murderer had broken into the home. The state asserted that because no glass was found in Dao Xiong's shoes, it was likely that the window had been broken after he was murdered. The police speculated that if Dao Xiong had walked over the broken glass when entering the home, his shoes probably would have contained broken glass residue. The state further argued that Tran probably cut himself while breaking the window, and that this cut was the likely reason his blood was on the door.

The state's primary theory of the murder was that it was a planned conspiracy between Tran and Laura Xiong. The state's secondary theory was that Tran had broken into the Xiongs' home without Laura's permission and murdered Dao when he returned home. Under this secondary theory, the state suggested that Tran was obsessed with Laura Xiong and that this obsession could have led him to commit murder without her complicity.

At trial, Tran attempted to show that the police "rushed to judge" when they failed to follow up on other important leads. Specifically, Tran elicited testimony regarding a "deer party" that Dao Xiong had given in November 2003. A nephew of Dao Xiong's, C.S.X., had shown up at the deer party uninvited with two friends, which uninvited appearance Laura Xiong told the police had angered Dao Xiong. When interrogated by the police, C.S.X. refused to provide DNA to aid the investigation, but the police obtained DNA samples from his parents instead and were able to use their DNA to determine that none of the blood at the homicide scene

---

**3.** Cell phones operate by bouncing signals off "cell towers." The closest cell tower within a cell phone network, and only the closest tower, takes the phone call. Cell towers are usually between two and five miles apart. The records here indicated that the calls placed from Tran's first cell phone were processed through the tower nearest the Xiongs' home, implying that Tran was in the neighborhood of the Xiongs' home when the calls were made. The first cell phone also received several calls from friends of Tran and Tran's ex-wife during the afternoon of December 18, indicating that it was indeed Tran's general use phone. The records also indicate that the second cell phone, which Tran allegedly gave to Laura Xiong, was in the area of Laura Xiong's work place (where Laura Xiong undisputedly was) during the afternoon of December 18, 2003.

belonged to C.S.X. Tran additionally attempted to elicit testimony on cross-examination of police officers to the effect that C.S.X. was regarded by the police as a gang member, but the district court excluded this evidence. Tran did not call C.S.X. to testify and offered no evidence directly connecting C.S.X. to the murder.

Tran also elicited testimony on cross-examination regarding N.V., another relative, who had been dating Laura Xiong's niece, C.L., at some point before the murder. N.V. was allegedly angry at Laura Xiong for causing C.L. to break up with him, and Tran elicited testimony at trial to the effect that N.V. possibly admitted having pushed Dao on one occasion.[4]

The jury found Tran guilty of first-degree premeditated murder and second-degree intentional murder, but not guilty of first-degree murder committed in the course of a burglary. The district court entered judgment of conviction on the count of first-degree premeditated murder and sentenced Tran to life in prison without parole. This appeal followed.

## I.

 Tran argues that, because there was no "independent evidence" offered that Tran knew of Dao Xiong's life insurance policy, evidence of the policy and Laura Xiong's financial problems was irrelevant and therefore the district court abused its discretion when it admitted that evidence. To be admissible, evidence must be relevant. Minn. R. Evid. 402. Evidence of motive is relevant to show premeditation or intent. *State v. Moua,* 678 N.W.2d 29, 40 (Minn.2004); *State v. Nunn,* 561 N.W.2d 902, 908 (Minn.1997). Rulings on evidentiary matters rest within the sound discretion of the district court, and we will not reverse a court's evidentiary ruling absent a clear abuse of discretion. *Moua,* 678 N.W.2d at 37.

When making his argument that the district court abused its discretion in admitting the life insurance policy evidence and the evidence of Laura Xiong's financial difficulties, Tran urges our court to adopt a rule that Tran claims has been adopted by several other states. The rule that Tran urges us to adopt is that before evidence of the insurance policy on Dao Xiong's life could be admitted, "independent evidence" must have been submitted that Tran knew of the existence of the life insurance policy and, possibly, that he knew he would benefit from the policy. Tran claims that without such independent evidence, the life insurance policy evidence and evidence of Laura Xiong's financial difficulties were irrelevant and substantially more prejudicial than probative, violating both Minn. R. Evid. 402 and 403.

The state responds by arguing that there was evidence presented from which the jury could have concluded that Tran knew of the life insurance policy. Specifically, Laura Xiong admitted to a police officer that she had told Tran of the insurance. But this evidence is not conclusive on this issue. The statement made by Laura Xiong is not clear, because shortly after volunteering the information indicating that she may have told Tran about the insurance, she said she did so after her husband's death. Nevertheless, the state points out that the jury was free to believe Laura Xiong's first statement and to disbelieve her second statement. The state also claims that evidence at trial indicated that Laura Xiong was an accomplice to the

---

4. The transcript of an interview with N.V. indicated that N.V. said "I pushed him [Dao] around." However, the interviewing police officer said the statement was mistranscribed, and that N.V. actually said "I pushed *them* around." N.V.'s DNA was found in the Xiongs' home, but that was expected because N.V. babysat for the Xiongs.

murder, and therefore her knowledge of the life insurance policy and her financial difficulty are relevant because her motives could be considered the motives of her accomplice as well. The state asserts that it is entitled to prove its theory or theories of the case, and one of its two theories was that Laura Xiong and Tran were involved in a romantic relationship, that they talked constantly, that they were both in dire financial straits, that Laura Xiong knew of the life insurance policies, and that the two planned Dao Xiong's death for both love and money. The state argues that under such circumstances it is permissible to draw an inference of knowledge on Tran's part.

In support of his argument that the district court abused its discretion in admitting evidence of the life insurance policy, Tran cites various cases from other states which have held that before evidence of an insurance policy may be introduced, the state must produce evidence that indicates the defendant knew of the insurance policies. As mentioned above, the requirement that evidence of a defendant's knowledge of an insurance policy be introduced is based on relevancy considerations. If the defendant did not know of the insurance, then the evidence of the insurance policy is generally irrelevant to the case, as it could not have been a motivating factor. In addition, Tran argues that without the insurance evidence, evidence of Laura Xiong's financial condition would also be irrelevant.

While the cases Tran cites from other jurisdictions all purport to require some evidence that a defendant knew of a given insurance policy before evidence of that

policy may be admitted, the cases vary in how much and what type of evidence is required. Some of the cases, such as *People v. Gougas*, 410 Ill. 235, 102 N.E.2d 152, 154 (1951), *State v. Felker*, 27 Mont. 451, 71 P. 668, 670–71 (1903), and *State v. Beckham*, 334 S.C. 302, 513 S.E.2d 606, 610 (1999), appear to require explicit evidence that the defendant knew of the insurance policies.[5] But other cases, such as *Stoudemire v. State*, 261 Ga. 49, 401 S.E.2d 482 (1991), and *Smallwood v. Commonwealth*, 36 Va.App. 483, 553 S.E.2d 140 (2001), appear to be less restrictive regarding allowing insurance evidence. The *Stoudemire* court required "independent evidence at a nexus" between the crime and the insurance policy, and found none when, after the evidence of the existence of the insurance was announced to the jury, "the State neither made reference to the insurance policies nor made any attempt to connect the commission of the crime to the existence of the insurance policies." 401 S.E.2d at 483–84. In *Smallwood,* the Virginia Court of Appeals required some evidence or knowledge that the defendant was the beneficiary and that, despite the fact that the defendant and the victim were married, knowledge of the insurance policy could not be imputed to the defendant. 553 S.E.2d at 146. But the Virginia court also distinguished a case wherein a defendant took the stand and denied having knowledge of an insurance policy, saying that in that case the jury could hear evidence of the policy because it was relevant to the witness's credibility. *Id.*

Importantly, the cases cited by Tran also differ in how much circumstantial evidence is sufficient to allow admission of insurance evidence. In *Smallwood,* the

---

**5.** Some of these states have additional requirements; for example, (1) evidence that the defendant would benefit from the policies and (2) evidence that the policies were valid or that the defendant believed that the poli-

cies were valid. *Gougas,* 102 N.E.2d at 154 (requiring both); *Felker,* 71 P. at 670–71 (requiring that defendant believed policies were valid); *Beckham,* 513 S.E.2d at at 610 (requiring both).

Virginia court concluded that where a wife had attempted to make her husband the beneficiary of her life insurance policy the week before her murder, the marital connection alone was not sufficient evidence to show that the husband had knowledge of the policy so that it could be introduced into evidence. *Id.* The court held that other evidence was required. *Id.* But in *State v. White*, the North Carolina Supreme Court held that evidence that the defendant had become the beneficiary of her stepson's life insurance policy days before the stepson's death was admissible because "[d]efendant's husband was a life insurance agent, and the jury could reasonably infer that defendant, as his spouse, knew that the lives of the family members were insured and that defendant's husband would have discussed with defendant the decision to name defendant as a co-beneficiary of the victim's life insurance policy in place of the child's natural mother." 340 N.C. 264, 457 S.E.2d 841, 857–58 (1995).

In a recent case not cited by Tran, the Florida Supreme Court adopted the rule that the state must produce evidence of a nexus between the crime charged and the life insurance policy before evidence of the policy may be introduced. *Brooks v. State*, 918 So.2d 181, 189 (Fla.2005). But when it adopted this rule, the Florida court also indicated that inferences drawn from circumstantial evidence can satisfy the nexus requirement. *Id.* at 191. The Florida court stated that "evidence establishing the substantial sum of money Davis [defendant's cousin] promised to pay [the defendant] to complete the conspiracy to commit murder coupled with evidence of the modest financial means of Davis—a condition that would not have escaped his cousin's notice under these circumstances—more than satisfies this nexus requirement." *Id.* at 190.

We obviously are not bound to follow the case law of other states. However, we agree that, under our rules of evidence, without some evidence that the defendant probably knew of the existence of an insurance policy, evidence of the insurance policy would be irrelevant and should not be admitted. But evidence introduced at trial may be direct or circumstantial. Circumstantial evidence is defined as "[e]vidence based on inference and not on personal knowledge or observation." *Black's Law Dictionary* 595 (8th ed.2004). Tran appears to read the cases he cites from other jurisdictions to require direct evidence on one certain point—knowledge of insurance—and he requests that we articulate and uphold such a rule.

We do not believe that the cases from other jurisdictions uniformly support Tran's proposed rule that a defendant's knowledge of an insurance policy must be proven by direct evidence, and we decline Tran's invitation to adopt a special rule that requires direct evidence before insurance policies may be admitted. As mentioned above, evidence of an insurance policy is admissible under Minnesota law to show motive. *See, e.g., State v. Rhodes*, 657 N.W.2d 823, 841 (Minn.2003) (concluding that evidence of life insurance and of the defendant's household debt was admissible to show motive). Many other types of evidence are also admissible to show motive—for example, evidence of an affair, or other evidence of a victim's interference with a defendant's life. It is not apparent to us why insurance policies should be treated differently from any other evidence used to show motive. While Tran is probably correct that evidence of an insurance policy may be prejudicial, it can be relevant and probative and therefore admissible. *See* Minn. R. Evid. 402, 403. Moreover, such evidence does not appear likely to be more prejudicial than other

relevant evidence, for example, evidence of an affair.

While we conclude that there must be some evidence that a defendant knew of an insurance policy before such a policy may be introduced as evidence of the defendant's motive, we agree with the courts in *Brooks* and *White* that circumstantial evidence that the defendant probably knew of the existence of the insurance policy is sufficient. In *Brooks*, a conspirator, Davis, hired Brooks to kill an insured child and her mother. 918 So.2d at 186. The court found sufficient inferential evidence of knowledge of the insurance based on the fact that Davis was in difficult financial circumstances and Brooks knew of Davis's financial difficulties, but still apparently believed that Davis would be able to pay him $10,000 for committing the murder. *Id.* at 191. The circumstances in the case before us today are similarly suggestive.

The state introduced evidence that Laura Xiong and Tran had an intense romantic relationship that involved sexual relations. They met frequently and often called each other up to 25 times per day. It is a reasonable inference that Laura Xiong and Tran would have discussed their relative financial situations. Additionally, Laura Xiong owed $60,000 in credit card debt and $74,000 in unpaid income taxes, and was being pursued by creditors on several other significant debts. Tran had no independent source of income and lived off the generosity of friends and, in particular, girlfriends. If, as the state argued, Tran planned to murder Dao Xiong, it is a reasonable inference that Tran would have given some thought to the financial problems Dao Xiong's murder could potentially resolve, and could have depended on the insurance money to provide financial support for Laura Xiong and him. Indeed, had there been no insurance in the case, there would arguably have been less mo-

tive for Tran to kill Dao Xiong, as Dao Xiong was the primary wage earner for his family. Such reasoning is similar to that addressed by the Florida court in *Brooks. See id.* Finally, Laura Xiong stated that she told Tran about the insurance policy, though she later qualified her statement, adding that she had told Tran about the policy after Dao's death. While this arguably "direct" evidence does not control our decision here, it does support the inference that Tran knew of the insurance policies.

Additionally, though there is no evidence that Tran expected "payment" as such from Laura Xiong, there is evidence that he would reasonably have expected to benefit from the insurance proceeds Laura Xiong received. Tran appears at the time of the murder to have lived for some time off the generosity of others, in particular the women in his life, including his ex-wife, two ex-girlfriends, and a female friend. More generally, Tran and Laura Xiong were in an intimate relationship, and such relationships often involve helping out the other when he or she is financially disadvantaged. It appears reasonable to expect that one partner's sudden acquisition of wealth would result in benefits for the other partner. Additionally, if, as the state intimated in closing, Tran and Laura Xiong hoped to live together or marry, Tran would receive the benefits of the insurance through payment of his living expenses.

We decline to endorse the new rule proposed by Tran, which would require more evidence for the admission of evidence of an insurance policy than is required of any other type of motive evidence. We conclude that, as there was sufficient circumstantial evidence that Tran knew of the insurance policy, the evidence of the insurance policy was relevant. Therefore, we hold that the district court did not abuse its discretion in admitting the evidence of

the life insurance policy on Dao Xiong and the evidence of Laura Xiong's financial difficulties.[6]

## II.

Tran also claims that the district court abused its discretion in prohibiting him from eliciting evidence from police investigators about the alleged gang affiliation of a third party. At trial, the court allowed Tran to cross-examine the police investigators regarding certain suspects who Tran claimed should have been investigated more thoroughly. But the court refused to allow Tran to elicit testimony on cross-examination regarding the alleged gang affiliation of one of the suspects, C.S.X. The court stated that the gang affiliation testimony was barred under Minn. R. Evid. 403 because the testimony was substantially more prejudicial than probative. Tran alleges that the court's refusal to allow the gang affiliation testimony violated his Sixth Amendment right to confront and cross-examine the witnesses against him. Tran argues that this refusal was not harmless error because the alleged gang affiliation was an important part of Tran's argument that C.S.X. was a serious suspect who should have been investigated further.[7]

The state contends that admission of the gang affiliation testimony would have been improper because C.S.X. was not being put forward by Tran as an alternative perpetrator and did not meet the criteria for alternative perpetrator status. Furthermore, the state argues that evidence of C.S.X.'s alleged gang affiliation would be inadmissible character evidence under Minn. R. Evid. 404(b). Additionally, the state claims that the gang affiliation evidence, even if relevant and otherwise admissible, would be barred from admission under Minn. R. Evid. 403 because its probative value would be substantially outweighed by the danger of unfair prejudice. Furthermore, the state argues that even if the exclusion of the gang affiliation testimony was error, it was harmless, as Tran was able to elicit information about several suspects, including C.S.X., and to vigorously argue that the police failed to follow up on those suspects.

Rulings on evidentiary matters rest within the sound discretion of the district court. *Moua*, 678 N.W.2d at 37. We will not reverse a court's evidentiary ruling absent a clear abuse of discretion. *Id.* "Based on concerns about such things as harassment, decision making on an improper basis, confusion of the issues, and cross-examination that is repetitive or only marginally relevant, the [district] court possesses wide latitude to impose reasonable limits on cross-examination of a prosecution witness." *State v. Lanz–Terry*, 535 N.W.2d 635, 639 (Minn.1995). "[T]he discretionary authority of the [court] to control the scope of cross-examination is limited by the Confrontation Clause of the

6. Because we have concluded that the circumstantial evidence that Tran knew of the insurance policy is sufficient to support admission of the insurance policy to prove motive, we need not address the state's alternative argument that Laura Xiong's knowledge of the insurance policy could be imputed to Tran as a co-conspirator.

7. Tran points out that the police initially thought the killing might be gang-related because of the "execution-style" nature of the shooting. Additionally, Tran claimed at trial that the jury would not be able to understand why the deer party incident might have driven C.S.X. to commit murder unless they knew that C.S.X. was a member of an Asian gang. Tran alleged that within Asian gangs, respect is very important, and C.S.X. might have perceived Dao's displeasure at C.S.X.'s uninvited appearance at the party as disrespect. Tran produced no evidence that C.S.X. did in fact feel insulted by or angry with Dao.

Sixth Amendment." *Id.* at 640. However, we have said that "[t]he Confrontation Clause guarantees only 'an opportunity for cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *State v. DeVerney,* 592 N.W.2d 837, 845 (Minn.1999) (quoting *Kentucky v. Stincer,* 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987)).

In *DeVerney,* we held that it was not a violation of DeVerney's Sixth Amendment rights for the district court to allow DeVerney to closely question a witness regarding how the witness's sentence could be reduced in exchange for the witness's testimony, but to forbid DeVerney from inquiring about the precise number of months by which the sentence could be reduced. *Id.* In general, we have stated that the main purpose of cross-examination under the Confrontation Clause is to allow the defendant an opportunity to reveal bias, and "thereby 'to expose to the jury the facts from which jurors * * * could appropriately draw inferences relating to the reliability of the witness.'" *Lanz–Terry,* 535 N.W.2d at 640 (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

Here, the purpose of the Confrontation Clause is not directly implicated because, in attempting to elicit testimony from police investigators regarding the alleged gang affiliation of a third party, Tran's goal was not to show bias on the part of the police investigators. The Confrontation Clause would have been more appropriately implicated if Tran had called C.S.X. himself to the stand to question him about his alleged gang activity. As it is, the Confrontation Clause does not prohibit the district court's exclusion of the alleged gang affiliation evidence because, like the defendant in *DeVerney,* Tran was still able to effectively cross-examine the police investigator witnesses for bias.

The district court allowed Tran to elicit information regarding the November "deer party" incident, C.S.X.'s refusal to submit to DNA testing, and the investigator's initial suspicions regarding C.S.X. But the court concluded that testimony regarding C.S.X.'s alleged gang affiliation was barred by Minn. R. Evid. 403 because the gang affiliation evidence was substantially more prejudicial than probative. The record indicates that the court closely considered both the concerns of the state and the defense on the matter of introduction of evidence regarding C.S.X. We conclude that Tran was able to introduce sufficient relevant evidence regarding C.S.X. to make clear to the jury Tran's argument that the police had not properly investigated. Here, the court correctly concluded that the gang affiliation evidence was only minimally probative and would have caused significant prejudice. We conclude that the court's decision to allow most of the evidence regarding C.S.X., but to prevent Tran from eliciting testimony regarding C.S.X's gang affiliation, was not an abuse of discretion.

■ Finally, we note that Tran's attempt to introduce the gang affiliation evidence under the guise of criticizing the police investigation is problematic because it appears that Tran may be attempting to circumvent the rule we have recently articulated regarding alternative perpetrator evidence. We have held that alternative perpetrator evidence is not relevant and therefore inadmissible absent some evidence having an inherent tendency to connect the alternative perpetrator with the crime. *State v. Jones,* 678 N.W.2d 1, 16 (Minn.2004). Here, C.S.X. was not being put forward as an alternative perpetrator; defense counsel admitted that Tran did not have sufficient evidence to tie C.S.X. to the

552

crime and satisfy the alternative perpetrator standard. While the district court was correct that Tran was entitled to some latitude when questioning investigators regarding their lack of interest in other potential suspects, the court was also correct in its conclusion that delving too deeply into the prejudicial history of some of these suspects via cross-examination of the investigators is in essence bringing alternative perpetrator evidence in through the back door. Here, we want to emphasize that the alternative perpetrator rule cannot be circumvented in this manner.

Affirmed.