STATE of Minnesota, Respondent,

v.

Troy Demetrius MAYHORN, Appellant.

No. A04–1971.

Supreme Court of Minnesota.

Aug. 31, 2006.

Bridget Kearns Sabo, Assistant State Public Defender, Minneapolis, MN, for appellant.

Mike Hatch, Attorney General, John B. Galus, Assistant Attorney General, St. Paul, MN, Lisa Borgen, Clay County Attorney, Moorhead, MN, for respondent.

## OPINION

MEYER, Justice.

Troy Demetrius Mayhorn appeals his convictions of aiding and abetting first-degree premeditated murder and aiding and abetting second-degree assault. Mayhorn argues that he is entitled to a new trial based on prosecutorial misconduct and various evidentiary errors made by the district court. Mayhorn also contends that the court erred in imposing a 51–month consecutive sentence for second-degree assault. We reverse Mayhorn's convictions, holding that the cumulative ef-

fect of prosecutorial misconduct and evidentiary errors deprived Mayhorn of a fair trial.

Around 2:20 p.m. on August 29, 2003, Janney Garcia dialed 911 and reported that her boyfriend had just been shot in the living room of her apartment in Moorhead, Minnesota. When police officers arrived at the apartment, they found Nasean Jordan lying on a couch just inside the doorway with multiple gunshot wounds to his chest. Garcia had been shot once in the leg but was standing and walking around. Nicole Johnson, a friend who lived nearby, was also at the apartment, having arrived just before emergency responders.

Investigators immediately began to locate Jordan's friends and associates. Mayhorn and Michael Dickey quickly were identified as suspects in Jordan's murder. Mayhorn and Jordan had met each other in Chicago as teenagers and became friends as well as partners in the trafficking of drugs, primarily crack cocaine. Dickey was also a friend of Mayhorn's and an associate of Mayhorn's and Jordan's in the drug trade. Also involved in the drug trade with them was Dickey's cousin, David Longmire. Investigators learned that Dickey had been admitted by Garcia or Longmire into Garcia's apartment building just before Jordan was killed.

The state's theory of the case at trial was that Mayhorn masterminded a plan to kill Jordan, and he drove the getaway car. The precise motive for Jordan's murder was never determined. One theory was that Jordan, who was known as "T.J.," was murdered by Mayhorn because Jordan was suspected of stealing drugs from him. Another theory was that Jordan had borrowed $800 from Mayhorn and had not repaid it. Evidence was also presented that Dickey was angry with Jordan because Jordan would not supply Dickey with drugs, and because Jordan had forcefully demanded that some of Garcia's acquaintances—including Dickey—stop spending time in Garcia's apartment.

Mayhorn's defense was that he had played no role in planning the murder and that he was not even in Moorhead at the time of the murder, although his green Ford Taurus may have been there.

It was undisputed at trial that on August 28, the day before the murder, Mayhorn and Muammar Ali drove from Chicago to Moorhead in Mayhorn's Taurus. They arrived in Moorhead around 7:30 p.m. and stopped at I–94 Liquors, where they purchased some liquor and left some garbage in the dumpster outside. Mayhorn and Ali spent the remainder of August 28 with a woman identified only as April. Around 2:30 a.m. on August 29, Mayhorn and Ali left April's home and drove to Garcia's apartment. Mayhorn testified that when they arrived, he went inside and delivered 63 grams of crack cocaine and 1 pound of marijuana to Jordan while Ali remained in the car. The state disputed the purpose of Mayhorn's and Ali's 2:30 a.m. trip to Garcia's apartment and asserted that the two men actually went there to kill Jordan, but their plan was thwarted because the exterior door had not been propped open as planned.

After leaving Garcia's apartment, Mayhorn and Ali drove to Kim Wilson's house, where a group of people, including Dickey, Longmire, Shawnee Johnson (one of Mayhorn's girlfriends), and others were socializing. Mayhorn went inside while Ali waited in the car. Inside Wilson's house, Dickey pressured Mayhorn to sell Dickey some crack cocaine. Mayhorn told Dickey that if Dickey could get to the Twin Cities, Mayhorn could arrange for him to obtain some drugs there. The state also presented evidence that Mayhorn said to Dickey, "[H]e gotta go," meaning Mayhorn wanted

Jordan killed, but both Mayhorn and Dickey dispute that there was any such discussion at Wilson's house. Mayhorn then agreed to drive Dickey—who was unable to find another ride—to the Twin Cities. At 4:30 a.m. on August 29, Mayhorn, Dickey, and Ali left Moorhead in Mayhorn's Taurus. They arrived in Woodbury at 8:30 a.m. and went directly to Lyra Robinson's townhouse.

For the events beginning at 10 a.m. on August 29, the parties' versions of the facts diverge significantly. The state presented evidence that the three men obtained their crack cocaine and were back in Mayhorn's car on the road to Moorhead by 10 a.m. During the drive to Moorhead, Mayhorn said to Dickey, "TJ gotta go," ostensibly meaning Jordan should be killed. At around 2:15 p.m., Mayhorn, Dickey, and Ali arrived outside Garcia's apartment building. Mayhorn remained in the car while Dickey and Ali walked up to the apartment building. Dickey "buzzed" the intercom and was admitted to the building. Ali went inside the building and into Garcia's apartment and found Jordan playing a video game with Longmire. Ali asked Jordan, "[W]here that sh* * at?" and started shooting. Dickey and Longmire fled to Mayhorn's car and got in the back seat. Ali then came running out and got in the car. As they were driving away, Mayhorn asked Ali, "[I]s he gone?" Ali answered affirmatively.

Four eyewitnesses testified that they had seen one to three men matching the physical descriptions of Dickey, Ali, and Longmire near or inside Garcia's apartment building at the time of the murder. One of these witnesses testified that the three men got into a green car driven by a fourth person.

Dickey testified against Mayhorn and said when Mayhorn drove him to the Twin Cities to get crack, Ali was in the car. As

they were driving to the cities Mayhorn said that T.J. "gotta go." Dickey understood Mayhorn's statement to mean that T.J. was to die or be hurt. After they picked up the drugs in Woodbury, Dickey testified that the three of them drove back to Moorhead in Mayhorn's car.

Cell phone records were received into evidence. The state also presented maps that plotted the calls made and received on both Mayhorn's and Dickey's cell phones for the time period of August 28–30. The records and maps showed that Mayhorn's cell phone traveled from Chicago to Moorhead on August 28. In the evening and early morning hours of August 28–29, Mayhorn's cell phone was activating a Moorhead cell tower. By the morning hours of August 29, both Mayhorn's and Dickey's cell phones were activating towers in the Twin Cities. Both cell phones were back in Moorhead by 2:14 p.m. on August 29, around the time of the murder. By 12:16 a.m. on August 30, both cell phones were back in Chicago.

Longmire also testified for the state and said at the time of the murder he was in Garcia's apartment with Garcia and Jordan, playing a video game with Jordan. Longmire saw Ali enter the apartment with a handgun and heard him say, "Where that sh* * at?" and start shooting. Longmire ran out of the apartment to Mayhorn's green Taurus. Mayhorn was in the driver's seat. Ali, Mayhorn, Longmire, and Dickey drove to Chicago, and Mayhorn warned Longmire and Dickey not to say anything.

Mayhorn testified in his own defense and claimed that he was not a part of any conspiracy, and although his car may have been in Moorhead at the time of the murder, he was not. Mayhorn told Dickey that he could take his car and return to Moorhead without Mayhorn. Mayhorn's cell phone was charging in his car at the

time, and Dickey took the cell phone with him when he left the Twin Cities around 10 a.m. At about 6 p.m., Dickey returned in Mayhorn's car, picked up Mayhorn, and they drove to Chicago.

Mayhorn presented an alibi witness, Lyra Robinson, who testified that Mayhorn was taking a nap at her Woodbury apartment at the time of the murder. He also called Toistine Pleasant, a previous girlfriend, who claimed that she called Lyra Robinson in Woodbury about an hour after the murder and Robinson told Pleasant that Mayhorn was with her.[1] The defense suggested that robbery may have been a motive for Jordan's murder, and that Garcia may have been involved. The defense also presented evidence that Jordan was not well liked, was "big-headed," had aggressively tried to take over the drug trade in Moorhead, and had come between Garcia and her previous boyfriend. To bolster this argument, Mayhorn presented evidence that although Jordan was living with Garcia, Jordan had other girlfriends in Moorhead, a fiancée in Chicago, and two "baby-mamas"[2] by whom he had five children.

After a three-week trial, the jury found Mayhorn guilty of aiding and abetting first-degree premeditated murder, conspiracy to commit first-degree premeditated murder, and aiding and abetting second-degree assault. The court imposed a mandatory life sentence for aiding and abetting first-degree premeditated murder and a consecutive 51–month sentence for aiding and abetting second-degree assault. This direct appeal followed.

## I.

The district court admitted into evidence over Mayhorn's objection the recordings of telephone calls made by Mayhorn from the Otter Tail county jail as he was awaiting trial. On appeal, Mayhorn argues that four of the recordings were inadmissible because they were not relevant and their probative value was substantially outweighed by the danger of unfair prejudice. Mayhorn argues that one of the four telephone calls was also inadmissible because it was evidence of a prior bad act for which the state failed to comply with *Spreigl* requirements. The state's position is that the admission of the recordings was not a clear abuse of discretion and that Mayhorn has not met his burden of proving that he was prejudiced by the admission of any of them. Additionally, the state asserts that the fourth recording was relevant to illuminate the relationship between Mayhorn and Jordan, such that *Spreigl* requirements did not apply.

We review a district court's decision to admit evidence for an abuse of discretion. *State v. Lee*, 645 N.W.2d 459, 465 (Minn.2002). The threshold requirement for the admissibility of evidence is provided by Minn. R. Evid. 402: "Evidence which is not relevant is not admissible." Reversal is required for the erroneous admission of evidence when the admission of that evidence likely influenced the jury to convict. *Lee*, 645 N.W.2d at 465.

In the first recording, Mayhorn is speaking to Nicole Johnson, the friend who arrived at Garcia's apartment shortly after the shooting, and states that he would prefer to "be around in Cook County where I was around killers and drug deal-

---

1. Moorhead is approximately 250 miles from Woodbury. Mayhorn could not have participated in the shooting in Moorhead and then traveled to Woodbury within one hour.

2. A "baby mama" is the mother of one's child, with whom one may or may not be in a current relationship.

ers" than in the Otter Tail county jail "around mother f* * * * *g, um, ah, thieves and mother f* * * * *g women beaters," who were "[n]ot my type of crowd."[3] The basis of the court's ruling on the admissibility of this recording is unclear from the record.

On appeal, the state does not address the relevance of this portion of the conversation with Nicole Johnson, merely contending that the entire conversation is relevant because Mayhorn was speaking to a potential witness. We have never concluded that all recorded conversations between a suspect and a potential witness are per se relevant. In any event, we conclude that the specific content of the objected-to portion of this recording had no probative value. Mayhorn's derogatory comments about the prisoners at the local jail are not probative of whether he engaged in conspiracy to commit murder, or aided and abetted murder and assault. These comments only tend to demonstrate Mayhorn's apparent preference for the company of certain criminals over others, and their admission may have allowed the inference that Mayhorn preferred to be around "killers" because he was one. Because the comments in the first recording are not relevant to any issue in the case, we hold that the court abused its discretion in admitting the comments into evidence.

■ The court also admitted over objection a voicemail message left by Mayhorn for Nicole Johnson in which Mayhorn stated: "What's up man? You don't f* * * with the ni* * *r no more. You need to holler at your boy straight up." The state asserts that this message was a threat against Nicole Johnson, a potential witness. Mayhorn's position is that the message meant, "What's going on * * * I'm trying to reach you," and was not meant as a threat.

■■ Evidence of a threat made by the defendant against a witness may be relevant to show consciousness of guilt, *State v. Harris*, 521 N.W.2d 348, 353 (Minn. 1994), and to explain a witness's inconsistent statements, *State v. Clifton*, 701 N.W.2d 793, 797 (Minn.2005) (quoting *United States v. Thomas*, 86 F.3d 647, 654 (7th Cir.1996)). It is possible to interpret this voicemail message as a threat against a witness and, therefore, we conclude that the court did not abuse its discretion in implicitly determining that it was relevant. We also defer to the district court's implicit finding that the recording was not unduly prejudicial. The district court was in the best position to evaluate the prejudicial nature of this evidence. *Cf. State v. Gaulke*, 281 Minn. 327, 330, 161 N.W.2d 662, 664 (1968) (noting that the trial judge was in the best position to evaluate the prejudicial nature of a closing argument).

■ A third recording admitted over Mayhorn's objection was his statement to an unidentified female to "keep [Shawnee Johnson] away from the police right now." Shawnee Johnson had been with Mayhorn in the early morning hours of August 29. She was not called as a witness by the state or the defense, but from her involvement with Mayhorn it is fair to conclude that the police may have wanted to interview her. A defendant's attempt to prevent a person from participating in a police investigation may be relevant to show consciousness of guilt. *See Harris*, 521 N.W.2d at 353 & n. 6. We conclude that this attempt to keep Shawnee Johnson away from law enforcement tended to show a consciousness of guilt and, there-

---

**3.** A larger portion of this recording included an update by Nicole Johnson on several acquaintances involved in the murder investigation and their contact information. Mayhorn does not dispute the relevancy of those portions.

fore, it was relevant. Further, we conclude that the content of this recording was not unfairly prejudicial and, therefore, the court did not abuse its discretion in admitting this recording.

We address Mayhorn's final claim of evidentiary error, that the court erred by admitting a recorded conversation in which Mayhorn describes "an ugly shootout" with a person named "T.J." without requiring a *Spreigl* analysis. *See State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965). The state sought to admit this evidence to show the past relationship between Mayhorn and Jordan, who was known as "T.J." The state essentially argues that relationship evidence involving a prior bad act is not subject to the notice requirements under *Spreigl*. We need not determine in this case whether relationship evidence is subject to the notice requirement of *Spreigl* because the state failed to establish by clear and convincing evidence that the referenced shootout involved Jordan.[4] *See State v. Bauer*, 598 N.W.2d 352, 364 (Minn.1999) ("Character evidence which tends to show the 'strained relationship' between the accused and the victim is relevant to establishing motive and intent and is therefore admissible. Prior to admitting such evidence, the trial court must determine that there is clear and convincing evidence that the defendant committed the prior bad act * * *" (internal citations and quotation marks omitted)). If the state intends to present relationship evidence, it bears the burden of proving that the incident at issue actually involved the relevant parties in the present case. The evidence otherwise has no probative value as relationship evidence.

Mayhorn did not dispute that he participated in a shoot-out with an individual identified as "T.J.," but he denied that T.J. was Jordan. The state did not present clear and convincing evidence that Jordan was the person referred to by Mayhorn as T.J., the person involved in the shoot-out. The only evidence from the state on this point came from Nicole Jordan during questioning by the state:

Q: Okay. So do you know of any conflict between your brother and [Mayhorn] when they were down in Kok[o]mo?

A: He mentioned a couple of times that they got into it, you know. He wouldn't get into deep details * * *.

* * * *

Q: Now, you told us that you had talked to your brother and he said there was some conflict down in Kok[o]mo, is that right?

A: Yeah.

Q: And that was between him and [Mayhorn]?

A: Yeah.

Q: Did your brother ever tell you that he got shot at?

A: Yeah.

Q: By anybody?

A: He said it before, yeah.

This exchange makes clear that Nicole Jordan had no firsthand knowledge of the type or nature of the conflict her brother reported having with Mayhorn. In response to the state's direct question, she did not identify Mayhorn as a person who shot at her brother. This evidence does not clearly and convincingly establish that a shoot-out occurred between Mayhorn and Jordan, and therefore we conclude that Mayhorn's statement regarding an

---

4. The state contends that the shoot-out was between Mayhorn and Jordan, and occurred in Kokomo, Indiana. Mayhorn's position is that the shoot-out occurred in Chicago between him and Trillus Bailey, Jr., the maternal uncle of two of Mayhorn's children.

"ugly shoot-out" was not admissible as relationship evidence.

■ Reversal is required for the erroneous admission of evidence when the admission of that evidence substantially influenced the jury to convict. *Lee,* 645 N.W.2d at 465. We note at the outset that the state made numerous references to the erroneously-admitted shoot-out evidence— the state referenced it directly or indirectly a total of 13 times during cross-examination, once during closing argument and once during its rebuttal to Mayhorn's closing argument. The fact that the prosecutor made repeated references to the shoot-out is important to our conclusion that the combination of evidentiary errors and prosecutorial misconduct rendered the trial unfair.

We need not decide whether the evidentiary errors alone warrant a new trial because we conclude that the cumulative effect of the prosecutorial misconduct and evidentiary errors in the case denied Mayhorn his right to a fair trial. Our reasoning follows.

## II.

Mayhorn claims he is entitled to a new trial because the prosecutor committed serious misconduct in the course of cross-examining him. Mayhorn frames his argument regarding prosecutorial misconduct in the two-tiered structure we identified in *State v. Powers:*

> This court reviews claims of prosecutorial misconduct and will reverse only if the misconduct, when considered in light of the whole trial, impaired the defendant's right to a fair trial. * * * *There are two distinct standards. If the misconduct was serious, the misconduct is harmless beyond a reasonable doubt if the verdict rendered was surely unattributable to the error. For less serious misconduct, the standard is whether the*

> *misconduct likely played a substantial part in influencing the jury to convict.*

654 N.W.2d 667, 678 (Minn.2003) (emphasis added; internal quotation marks and citations omitted). In more recent opinions, we have retained the general rule of reversing only when prosecutorial misconduct impairs the defendant's right to a fair trial, but we have adopted a streamlined approach to our analysis. In *State v. Swanson,* we held:

> When reviewing claims of prosecutorial misconduct, we reverse only if the misconduct, when considered in light of the whole trial, impaired the defendant's right to a fair trial. *If the state has engaged in misconduct, the defendant will not be granted a new trial if the misconduct is harmless beyond a reasonable doubt. We will find an error to be harmless beyond a reasonable doubt only if the verdict rendered was surely unattributable to the error.*

707 N.W.2d 645, 658 (Minn.2006) (emphasis added; internal quotation marks and citations omitted). The language in *Swanson* provides the structure for our analysis of objected-to prosecutorial misconduct.

■ When a defendant fails to object at trial, he generally forfeits consideration of prosecutorial misconduct on appeal, but we can still address the misconduct under the plain-error doctrine. *State v. Blanche,* 696 N.W.2d 351, 375 (Minn.2005); *see also State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). Before we review an error for which there was no objection, there must be (1) error, (2) that is plain, and (3) the error must affect substantial rights. *Griller,* 583 N.W.2d at 740. If all three prongs are satisfied, we determine whether we should address the error to ensure the fairness and integrity of the judicial proceedings. *Id.* (citing *Johnson v. United*

*States*, 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)).

*Commenting on the Defendant's Credibility as a Witness*

 During her cross-examination of Mayhorn, the prosecutor asked, "You wouldn't know the truth if it hit you in the face, would you, Mr. Mayhorn?" Mayhorn did not object. The state conceded at oral argument that this comment was inappropriate. We agree. We have held that it is improper for a prosecutor to give her own opinion about the credibility of a witness in closing argument. *See State v. Porter*, 526 N.W.2d 359, 364 (Minn.1995). It follows that a prosecutor may not do the same during cross-examination. We conclude that this remark about Mayhorn's ability to recognize the truth constituted misconduct.

*Inflaming the Passions of the Jury*

 Mayhorn argues that the prosecutor committed misconduct when, during cross-examination of Mayhorn, she improperly gave the jury prejudicial information about Mayhorn's prior dangerous use of a firearm and portrayed Mayhorn as "an aggressive person who carried a gun and shot at people." Specifically, Mayhorn challenges the following exchange during his cross-examination by the state:

Q: Okay. Now, we heard you try to explain away this shootout thing that we heard a tape [sic] a couple different times. You're not denying that you had a shootout with someone though, are you?

A: No.

Q: Okay. You're not denying that you were in a car and someone was shooting at you and you shot back, right?

A: Right.

Q: Okay. So in order to shoot back you had to have something in your hand, right?

A: Yes.

Q: What would that be?

A: A gun.

Q: Okay. So do you consider yourself pretty handy with a gun?

A: No.

Q: You didn't kill anyone there. At least you didn't tell us about it, right?

Mayhorn did not object. The state contends that these remarks were not improper because they merely indicated that Mayhorn acted in self-defense on a previous occasion. We disagree with the state's characterization.

Although the district court excluded evidence about Mayhorn's previous conviction for felony possession of a handgun, it admitted evidence of the shoot-out. Because the state's line of questioning related specifically to the shoot-out, and not to Mayhorn's prior conviction for a separate offense, we conclude that it did not provide the jury with any excluded evidence on the prior conviction. But with this line of questioning, the state capitalized on and compounded the court's error in having admitted evidence of an alleged shoot-out between the defendant and the victim. We further note that this was not an isolated incident—the state referenced the shoot-out directly or indirectly a total of 13 times during cross-examination, once during closing argument, and once during its rebuttal to Mayhorn's closing argument. The fact that the prosecutor made repeated references to the shoot-out affects our analysis of the impact of the prosecutor's misconduct.

 Additionally, the tenor of the prosecutor's remarks appears to have been intended to inflame the passions and prejudices of the jury. A prosecutor must not

appeal to the passions of the jury. *Porter,* 526 N.W.2d at 365. When credibility is a central issue, this court pays special attention to statements that may inflame or prejudice the jury. *State v. Morton,* 701 N.W.2d 225, 236 (Minn.2005). Credibility was a central issue in this case. Some of the strongest evidence against Mayhorn was the testimony of Dickey and Longmire regarding Mayhorn's role in the shooting and the testimony of two other witnesses, Steven Johnson and Nicole Jordan, regarding telephone conversations they had had with Mayhorn that afternoon. We conclude that by engaging in this line of questioning, the prosecutor appealed to the passions of the jury and thereby committed misconduct.

*Commenting on the Defendant's Failure to Call a Particular Witness*

 Mayhorn argues that the prosecutor committed misconduct when she commented on his failure to call April as an alibi witness. Mayhorn did not object. Mayhorn and Ali had visited with April on their way into Moorhead on August 28, the day before Jordan's murder. During the state's cross-examination of Mayhorn, the following exchange occurred:

Q: What's April's last name?

A: I don't know her last name.

Q: Never thought that it would be smart maybe to get your investigator to find out who April was and have her come in because she could help you with an alibi too, couldn't she?

A: I mean—

Q: Never thought of that, huh?

 It is well-settled that a prosecutor may not comment on a defendant's failure

to call a witness. *State v. Fields,* 306 Minn. 521, 522, 237 N.W.2d 634, 634 (1976). There are two reasons for this rule: (1) the comment suggests that the defendant bears some burden of proof; and (2) the comment suggests that the defendant did not call the witness because his or her testimony would be unfavorable. *Id.* at 522, 237 N.W.2d at 634. We conclude that the state committed misconduct in asking this question, and compounded the error by repeating it.[5]

*Intentionally Misstating the Evidence and Asking a "Were They Lying?" Question*

 Mayhorn argues that the prosecutor committed misconduct by misstating the evidence regarding the shoot-out during cross-examination of Mayhorn. We agree. The state called Nicole Jordan as a witness, and elicited the following testimony on direct examination:

Q: Okay. So do you know of any conflict between your brother and [Mayhorn] when they were down in Kok[o]mo?

A: He mentioned a couple of times that they got into it, you know. He wouldn't get into deep details * * *.

\* \* \* \*

Q: Now, you told us that you had talked to your brother and he said there was some conflict down in Kok[o]mo, is that right?

A: Yeah.

Q: And that was between him and [Mayhorn]?

A: Yeah.

Q: Did your brother ever tell you that he got shot at?

A: Yeah.

---

5. Moreover, we note that this question may have been confusing to the jury. It is not clear whether the state's intention was to imply that April played a greater role in these events than the evidence suggests, or to imply that Mayhorn was prone to fabricating alibis. We note that neither objective is proper.

Q: By anybody?

A: He said it before, yeah.

Later, in the state's cross-examination of Mayhorn, the following exchange occurred without objection:

Q: Mr. Mayhorn, you were in the courtroom when Nicole Jordan testified that she knew of a shootout that you and her brother were in in Kokomo, right?

A: No. She—I don't remember her saying anything about a shootout.

Q: You don't remember her saying that from that witness stand * * *? She talked about a shootout in Kokomo [involving Jordan and Mayhorn].

A: No, because TJ and I were never in a shootout in Kokomo.

Q: So you would remember that, right?

A: Yes.

Q: So Nicole Jordan must have been lying from the witness stand, is that correct?

 We conclude that the prosecutor's questions misstated Nicole Jordan's testimony. Because of the earlier arguments to the court regarding the admissibility of the shoot-out recording, the state should have been sufficiently familiar with Nicole Jordan's testimony to avoid inadvertently misstating it. We therefore conclude that this misstatement was intentional. A prosecutor commits misconduct by intentionally misstating evidence. *See State v. Torres*, 632 N.W.2d 609, 618 (Minn.2001); *State v. Salitros*, 499 N.W.2d 815, 817 (Minn.1993) (quoting Standards for Criminal Justice § 3–5.8(a) (1979)) ("It is unprofessional conduct for the prosecutor intentionally to misstate the evidence * * *."). We conclude that the prosecutor's misstatement of Nicole Jordan's testimony constituted misconduct. Mayhorn argues that the prosecutor compounded the error of misstating Nicole Jordan's testimony when she asked him, "So Nicole Jordan

must have been lying from the witness stand, is that correct?" We agree. This court has not adopted a blanket prohibition of "were they lying" questions, but "such questions have no probative value and are generally improper." *Clifton*, 701 N.W.2d at 801. We conclude that this question—to which Mayhorn objected at trial—constituted misconduct.

*Referring to Threats Not in Evidence*

 Mayhorn argues that the prosecutor committed misconduct by referring to apparent threats in telephone calls that were not in evidence. Mayhorn objected. The relevant exchange took place during the state's cross-examination of Mayhorn:

Q: We listened to a tape and you talked about putting the dogs on ya. Do you remember that?

A: Yes.

Q: I know what to say to put my dogs on ya, but I don't know what to say to get them off, right?

A: Yeah. I was talking to my little sister.

Q: Well, you've said that three times in your phone calls, Mr. Mayhorn. Not just to your sister.

\* \* \* \*

Q: Right, but you said it again to another man you were talking to on November 2nd, didn't you? Do you remember saying that? I know what to say to put my dogs on you. I don't know what to say to get them off. You heard me. Do you remember saying that?

A: I remember saying it to my sister. I might have said it a few more times after that.

Q: Right. You said it a few more times when you were talking to people, especially because you want people to know who you're talking to, that even though

you're not available right now that you still have the means to get them, right?

A: No.

The court excluded portions of the shoot-out recording in which Mayhorn said he could "put the dogs on ya" to the person he identified on cross-examination as his sister. But Mayhorn himself introduced the "put the dogs on ya" portion of the conversation with his sister as part of his effort to demonstrate that the T.J. referenced in the shoot-out recording was Trillus Bailey, Jr. The record suggests that there were other telephone calls in which Mayhorn discussed "putting the dogs on" people, but none of these recordings were admitted into evidence. Because of the court's earlier ruling excluding Mayhorn's statement that he could "put the dogs on" his sister, the state had no good faith basis to believe that the court would have admitted statements by Mayhorn to other individuals that he could "put the dogs on" them. Because the state had no good faith basis to believe these apparent threats would have been admissible, we conclude that the prosecutor committed misconduct by referring to them during cross-examination of Mayhorn.

*Aligning Self with the Jury and Character Attacks*

■ Mayhorn argues that the prosecutor committed misconduct by stating, "This is kind of foreign for all of us, I believe, because we're not really accustomed to this drug world and drug dealing." Mayhorn objected. We have held that a prosecutor's statement describing a defendant as not being from the same world as the jurors is not misconduct when "these comments did little more than prepare the jury for evidence of an unfamiliar world involving drugs." *State v. Robinson,*

604 N.W.2d 355, 363 (Minn.2000), *denial of habeas corpus affirmed by Robinson v. Crist,* 278 F.3d 862 (8th Cir.2002). But it *is* improper for a prosecutor to highlight the defendant's racial or socioeconomic status as a way to put evidence in context. *See State v. Ray,* 659 N.W.2d 736, 746–47 (Minn.2003) (noting that prosecutors should avoid inviting jurors to apply racial and socio-economic considerations). Although the challenged statement refers explicitly to "this drug world," we note our concern that there may have been instances in this trial in which the state attempted to highlight cultural differences between the predominantly white jury[6] and the defendant. For example, at one point during cross-examination, the prosecutor asked Mayhorn, who is African American, a question about the "white girls that you were hanging around with in Fargo–Moorhead."

■ Furthermore, the prosecutor appears to have used impeachment devices as a thinly-veiled character attack. During cross-examination of Mayhorn, the prosecutor asked him nearly 40 questions about his various girlfriends and "baby mamas," including one series of questions comprising more than five pages of trial transcript. The prosecutor repeatedly asked if Mayhorn's girlfriends knew about each other, and when he responded in the negative the prosecutor asked if this meant Mayhorn was lying to his girlfriends. Mayhorn twice objected to this line of questioning. In closing argument, the prosecutor stated "[Mayhorn] admits that he is a habitual liar," based in part on his responses to these questions.

■ "By voluntarily testifying in his own behalf, the accused opens up only the issue of his credibility, not his general character." *State v. Sharich,* 297 Minn.

6. It appears that one juror may have been of Latino ethnicity.

19, 23, 209 N.W.2d 907, 911 (1973). Under Minn. R. Evid. 608(b), specific instances of the conduct of a witness may be inquired into on cross-examination *if they are probative of the witness's truthfulness or untruthfulness.* The New Hampshire Supreme Court has held that "[a]lthough illegal and immoral, adultery do[es] not relate directly to truthfulness." *State v. Moses,* 143 N.H. 461, 726 A.2d 250, 253 (1999) (citation and quotation marks omitted; second alteration in original). We agree that adultery is not probative of a witness's truthfulness, and conclude that the same rationale applies to an unmarried person involved in more than one romantic relationship. We therefore conclude that the prosecutor engaged in improper impeachment and that this line of questioning amounted to an attack on Mayhorn's character, not his credibility.

 Finally, even to the extent it is permissible to describe a "drug world" of which the jury is not a part, it does not follow that a prosecutor may describe herself and the jury as a group of which the defendant is not a part. A prosecutor is a "minister of justice" whose obligation is "to guard the rights of the accused as well as to enforce the rights of the public." *Salitros,* 499 N.W.2d at 817 (quoting ABA Standards for Criminal Justice § 3–1.1 cmt. at 3.7 (2d ed.1979)). On a more basic level, a prosecutor is not a member of the jury, so to use "we" and "us" is inappropriate and may be an effort to appeal to the jury's passions. We conclude that the prosecutor committed misconduct when she attacked Mayhorn's character and aligned herself with the jury.

*Commenting on the Defendant's Opportunity to Tailor His Testimony*

 We next consider Mayhorn's argument that the prosecutor committed misconduct by repeatedly questioning Mayhorn about his opportunity to review the state's evidence before testifying in his own defense. Mayhorn objected to some of these questions. The prosecutor asked Mayhorn if he knew what Nicole Jordan, Nicole Johnson, and Steven Johnson had "said" about the case before Mayhorn testified. She also suggested that Mayhorn's statements to police differed from his testimony at trial because "you hadn't read all the police reports and the story didn't come to you then, did it?" In total, the prosecutor noted 10 times during cross-examination of Mayhorn and once during the state's rebuttal to Mayhorn's closing argument that Mayhorn had an opportunity to review the state's evidence, including the testimony of several witnesses and thousands of pages of police reports, before testifying.

We have recently addressed the propriety of a prosecutor commenting on the defendant's opportunity to tailor his testimony by his presence at trial and opportunity to review the evidence.

> [T]he prosecution cannot use a defendant's exercise of his right of confrontation to impeach the credibility of his testimony, at least in the absence of evidence that the defendant has tailored his testimony to fit the state's case. Without specific evidence of tailoring, such questions and comments by the prosecution imply that all defendants are less believable simply as a result of exercising the right of confrontation. The exercise of this constitutional right, by itself, is not evidence of guilt.

*Swanson,* 707 N.W.2d at 657–58. The state cites no evidence that Mayhorn actually tailored his testimony to fit the evidence previously presented at trial. Because there is no evidence of actual tailoring, we conclude that the prosecutor's remarks regarding Mayhorn's op-

portunity to tailor his testimony constituted misconduct.

*Commenting on the Credibility of a Witness*

█ Finally, during her rebuttal to Mayhorn's closing argument, the prosecutor commented that "Lyra" was an appropriate name for Lyra Robinson, who corroborated Mayhorn's testimony. Mayhorn did not object. We understand this comment to suggest that Lyra Robinson was a liar. The state conceded at oral argument that this comment was inappropriate. We agree. It is improper for a prosecutor to give her own opinion about the credibility of a witness in closing argument. *Porter*, 526 N.W.2d at 364. This comment constituted prosecutorial misconduct.

## III.

█ We turn to the question of remedy and consider whether the combination of the evidentiary errors and the multiple incidents and types of prosecutorial misconduct deprived Mayhorn of a fair trial. The state had a strong case against Mayhorn. Two witnesses, Dickey and Longmire, testified that Mayhorn participated in planning the murder and drove the shooter to and from the murder scene. Mayhorn conceded at trial that his car and cell phone could have been present at the murder scene. Two additional witnesses testified that they spoke with Mayhorn shortly after the shooting. Cell phone records confirmed their calls to Mayhorn's cell phone during this critical timeframe, and indicated that Mayhorn's cell phone was traveling away from the Moorhead area at the time. We conclude that on the basis of the admissible evidence, a reasonable jury could have found Mayhorn guilty as charged.

█ But even the strongest evidence of guilt does not eliminate a defendant's right to a fair trial. *Harris*, 521 N.W.2d at 355. "The role of the prosecutor and trial court is not simply to convict the guilty, they are also responsible for providing a procedurally fair trial." *Id.* The state has an overriding obligation, shared by the court, to see that the defendant receives a fair trial, regardless of the defendant's culpability. *Id.* (quoting *State v. Sha*, 292 Minn. 182, 185, 193 N.W.2d 829, 831 (1972)). Here, the state and the court failed to satisfy this overriding obligation. The prosecutor's misconduct was a pervasive force at trial. She commented on the defendant's credibility, appealed to the passions of the jury, commented on Mayhorn's failure to call a witness, intentionally misstated evidence, asked a "were they lying?" question, referred to threats made by Mayhorn not in evidence, aligned herself with the jury, improperly attacked Mayhorn's character, commented on Mayhorn's opportunity to tailor his testimony, and commented on the credibility of a witness. At least 20 pages of the prosecutor's 80–page cross-examination of the defendant evince prosecutorial misconduct. The scope of the misconduct in this case is unprecedented in this court's memory and calls to mind the words of Judge Jerome Frank of the Second Circuit:

> This court has several times used vigorous language in denouncing government counsel for such conduct as that of the United States Attorney here. But, each time, it has said, that nevertheless, it would not reverse. Such an attitude of helpless piety is, I think, undesirable. * * * If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it. * * * Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking.

*United States v. Antonelli Fireworks Co.,* 155 F.2d 631, 661 (2d Cir.1946) (Frank, J., dissenting).

Because of the number of errors and the seriousness of some of them, we are unable to determine whether the jury based its verdict on the admissible evidence and the reasonable inferences derived therefrom, or on the state's pervasive misconduct and the consideration of evidence that should have been excluded.

■■■ We are mindful that the constitution guarantees a fair trial—not a perfect or error-free trial. *See State v. Greenleaf,* 591 N.W.2d 488, 505 (Minn.1999). But if we are to sustain a murder conviction, we must be able to conclude that the conviction was based on admissible evidence presented at a fair trial.

The questions before the jury in this case were whether Mayhorn planned and participated in the murder of Nasean Jordan and participated in the shooting of Janney Garcia. Because of numerous incidents and types of prosecutorial misconduct and two evidentiary errors, we are not able to conclude that "the jury had a reasonable opportunity to focus on [those] question[s]." *Harris,* 521 N.W.2d at 355. We conclude that the cumulative effect of the prosecutorial misconduct and evidentiary errors in this case denied Mayhorn the right to a fair trial. We therefore reverse his convictions and remand the case for a new trial.

Reversed and remanded for a new trial.

GILDEA, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

ANDERSON, G. BARRY, Justice (dissenting).

The majority holds that Mayhorn's convictions must be reversed because of the cumulative effect of evidentiary errors and prosecutorial misconduct. While I agree that Mayhorn's trial was far from perfect, and I certainly do not seek here to excuse wrongful conduct on the part of the prosecution, I cannot conclude on this record that the state and the district court failed in their joint obligation to ensure a fair trial.

Analysis of this case for cumulative error is complicated because some errors were properly preserved for appeal by appropriate objection and others were not. Of course, an error that is preserved for appeal may ultimately be determined to be harmless and not grounds for reversal. *See Huff v. State,* 698 N.W.2d 430, 437 (Minn.2005). Concerning errors to which no objection was taken, the governing analysis is plain error and, as the majority notes, plain error must affect a defendant's substantial rights. *See State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998).

These same analyses apply when analyzing the cumulative effect of errors. With respect to errors to which no objection was taken, when applying the plain-error test of *Griller,* the key issue is whether the errors collectively affected Mayhorn's substantial rights such that reversal is the appropriate remedy. And, even if a determination is made that the errors affected substantial rights, we must determine whether the errors should be addressed to ensure the fairness and integrity of the judicial proceedings. *See Griller,* 583 N.W.2d at 740 (citing *Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)). As to the cumulative effect of errors to which objections were made, we have ultimately inquired whether the cumulative effect of the error was harmless. *See State v. Keeton,* 589 N.W.2d 85, 91 (Minn.1998) ("[W]e cannot conclude on this record that the cumulative

effect of these errors was harmless beyond a reasonable doubt.").

The majority concedes that the state had strong evidence of Mayhorn's guilt and describes that evidence in some detail. Because I conclude the evidence of Mayhorn's guilt was overwhelming, the cumulative effect of the errors to which objection was taken was harmless, and the errors to which Mayhorn did not object did not cumulatively affect his substantial rights or the overall fairness and integrity of the judicial proceedings.

A word should be said about our standard for determining whether prosecutorial misconduct to which objection was taken requires reversal. Reversal is warranted "only where the misconduct, viewed in the light of the whole record, appears to be inexcusable and so serious and prejudicial that [the] defendant's right to a fair trial was denied." *State v. Wahlberg*, 296 N.W.2d 408, 420 (Minn.1980). As the majority notes, we have historically applied a two-tiered standard and recently have chosen to apply a higher standard to the effect that a defendant will not be granted a new trial if the misconduct is harmless beyond a reasonable doubt. *Compare State v. Caron*, 300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (1974) (using two-tiered standard), *with State v. Swanson*, 707 N.W.2d 645, 658 (Minn.2006) (applying harmless beyond a reasonable doubt standard).

But however it is formulated, harmless-error analysis is a linchpin in the analysis of prosecutorial misconduct to which proper objection was taken and consideration of whether or not a new trial should be granted. *See* Bennett L. Gershman, *Prosecutorial Misconduct* § 14:3 (2d ed.2005). In federal cases, the Supreme Court has required reviewing courts to employ harmless-error analysis in prosecutorial misconduct cases. *See United States v. Hasting*,

461 U.S. 499, 509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) ("Since *Chapman*, the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations"); *Chapman v. California*, 386 U.S. 18, 24–26, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (applying harmless-error analysis to constitutional errors in a prosecutorial misconduct case, including improper comment on the defendant's failure to testify at trial).

My point in this analysis is that whether we apply the lower standard set out in *Caron* (distinguishing between constitutional and non-constitutional violations), the higher standard which we have more recently applied (*Swanson* ), or some other standard for evaluating prosecutorial misconduct, in any circumstance we look to whether the misconduct was harmless. In any event, the strength of the evidence is such that it is unnecessary to finally resolve the issue of which standard we should apply when analyzing the misconduct to which Mayhorn objected below. I would decline to reverse based on cumulative error as it relates to prosecutorial misconduct and evidentiary errors.

Finally, the majority, relying on *State v. Harris*, 521 N.W.2d 348 (Minn.1994), concludes that the cumulative effect of the errors and misconduct requires reversal and indicates that, since these trial errors violated Mayhorn's right to a fair trial, he is entitled to a new trial regardless of the strength of the evidence of guilt. While I certainly do not excuse the conduct of the prosecutor in this case, *Harris* involved prosecutorial misconduct of a more deliberate and pervasive nature than found here. *Id.* at 354 (describing how prosecutor, in violation of district court rulings, persistently sought to elicit inadmissible testimony concerning defendant's prior

bad acts). Essentially, the majority in this case prophylactically reverses the verdict and orders a new trial in the face of overwhelming evidence of guilt. I would not do so and, under these circumstances, I respectfully dissent.