*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1339**

State of Minnesota,
Respondent,

vs.

Deontray Vershon Tate,
Appellant.

**Filed March 14, 2016
Affirmed
Bjorkman, Judge**

Hennepin County District Court
File No. 27-CR-13-22120

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Brittany D. Lawonn, Assistant County
Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin Butler, Assistant Public
Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Halbrooks, Presiding Judge; Bjorkman, Judge; and
Chutich, Judge.

**U N P U B L I S H E D   O P I N I O N**

**BJORKMAN**, Judge

Appellant challenges his two first-degree-assault convictions and 309-month
sentence, arguing that (1) he was prevented from presenting a complete defense by the

exclusion of relevant evidence, (2) the evidence was insufficient to prove that the victims suffered "great bodily harm," (3) the district court plainly erred by permitting a doctor to testify that a gunshot wound is a "serious injury," (4) the prosecutor committed misconduct during closing argument, and (5) the district court abused its discretion by departing upward on one of his sentences and by imposing consecutive sentences. We affirm.

**FACTS**

In May 2013, A.D. and S.F. were involved in a verbal dispute during which S.F.'s husband—appellant Deontray Vershon Tate—was present. On the afternoon of June 25, A.D. and D.R. encountered S.F. at a store. A.D. and S.F. began to argue, and a physical fight ensued. When the fight subsided, A.D. and D.R. drove away. They later took A.D.'s children to a local pool where they were joined by A.D.'s cousin D.H. Around 9:00 p.m., the group traveled to D.H.'s mother's residence at the intersection of 36th Street and Penn Avenue in Minneapolis. After arriving at the home, A.D. and D.H. stood outside of the car talking. D.R. remained in the driver's seat of the car and A.D.'s two children were in the back seat. A.D. observed a van she knew belonged to S.F. approaching; S.F. was driving and Tate was in the passenger seat.

Moments later, A.D. saw Tate walking toward her through a convenience store parking lot located across the street. She noted that Tate was wearing black pants, black shoes, white socks, and a black "button-up." When Tate was "halfway to the street," he brandished a gun and began walking toward A.D.'s vehicle. A.D. ran toward her car to tell D.R. to drive away, but stopped when another man on the street corner began shooting. A.D. and D.H. then ran behind the house.

2

D.R. testified that he saw a "tall black guy" approaching the vehicle. D.R. recognized the man as Tate and noticed that he was wearing all black, except for a pair of white socks. Once Tate reached the vehicle, the two began "tussling with the gun." D.R. then heard four or five gunshots coming from another location. When D.R. turned back toward the children, Tate shot him in the lower back and thigh and shot one of the children, J.B., in the right leg. Tate then walked back toward the convenience store parking lot.

W.R. lived across the street from where the shooting occurred and witnessed these events. He heard several gunshots, looked out of his bedroom window, and saw a man standing by the driver's side of a vehicle parked on Penn Avenue. The man then walked across the street, and W.R. saw his face. W.R. identified the man—both during a photo lineup and in court—as Tate.

Sergeant David Voss of the Minneapolis Police Department was assigned to investigate. Sgt. Voss obtained surveillance video from the nearby convenience store. The video shows two men, one wearing dark clothing, walking through the parking lot. Several minutes later, the video shows the same two men and a group of other people running in the opposite direction across the parking lot. Finally, the video shows the two men getting into a vehicle and driving away.

During his investigation, Sgt. Voss spoke to A.D. and D.R. They each gave a general description of the events and involved individuals, but did not identify either shooter. A.D. told Sgt. Voss that she did not know of anyone who had a reason to commit the crime, stating that she was not "beefing" with anyone. During a photo lineup and in court at Tate's trial, A.D. and D.R. identified Tate as the person who shot into the vehicle.

3

A.D. testified that she did not initially identify Tate because she was upset with the police for keeping her away from her injured son after he was shot. D.R. testified that he did not immediately assist law enforcement with the investigation because he needed to make sure his "family was in [his] corner" before he said anything to the police.

Tate was charged with two counts of first-degree assault and one count of second-degree assault. The jury found him guilty of the first-degree offenses, and acquitted him of the second-degree charge. The jury specifically found that J.B. was four years old and was in the back seat of the vehicle with the doors closed when the shooting occurred. The jury also found that Tate shot D.R. in the presence of children. Tate moved for judgment of acquittal and a new trial, which the district court denied. The district court sentenced Tate to 309 months, which included a double upward departure for the assault on J.B. based on victim vulnerability, and a consecutive sentence for the assault on D.R.

Tate appealed, and moved to stay the appeal and remand for postconviction proceedings. This court granted the motion. Tate petitioned for postconviction relief, arguing that he was denied his right to present a complete defense because the district court excluded evidence that A.D. and D.R. had participated in an armed home invasion four days before the shooting. Tate asserted that the victims of the home invasion and their acquaintances fit the general description of the person who shot D.R. and J.B. In the alternative, Tate argued that he received ineffective assistance of counsel because this evidence was not properly introduced in the district court. The district court denied Tate's petition, determining that it did not meet the requirements for admitting alternative-perpetrator evidence. And the court noted that even if Tate's attorney had made a complete

4

offer of proof, the evidence would have been inadmissible because Tate could not connect another individual with the crime.

## D E C I S I O N

**I.**     **Exclusion of evidence regarding A.D. and D.R.'s participation in a prior home invasion did not deny Tate the right to present a complete defense.**

A defendant's right to present a complete defense includes the ability to present evidence suggesting that another person committed the charged offense. *State v. Pass*, 832 N.W.2d 836, 841 (Minn. 2013). But this right yields to the application of evidentiary rules. *Id*. at 841-42. "Alternative perpetrator evidence is admissible only if the defendant makes a threshold showing that the evidence the defendant seeks to admit has an inherent tendency to connect the alternative perpetrator to the commission of the charged crime." *State v. Ferguson*, 804 N.W.2d 586, 591 (Minn. 2011) (*Ferguson I*) (quotations omitted). This connection must be established beyond a bare suspicion. *State v. Blom*, 682 N.W.2d 578, 621 (Minn. 2004). If such a showing is made, the defendant may then introduce evidence of a motive or other facts that tend to prove a third party committed the crime. *State v. Atkinson*, 774 N.W.2d 584, 590 (Minn. 2009). We will not reverse a district court's evidentiary ruling absent a clear abuse of discretion. *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003).

Tate's primary defense at trial was that he was not the shooter. He sought to present evidence that A.D. and D.R. had committed the prior armed home invasion to show they had enemies who could have committed the crime. Tate concedes that the evidence was not sufficient to meet the alternative-perpetrator threshold, but argues that he should have

5

been allowed to present it to challenge the adequacy of the police investigation. *See State v. Nissalke*, 801 N.W.2d 82, 103 (Minn. 2011) (stating that a defendant is allowed to present evidence challenging the police investigation of alternative suspects); *State v. Tran*, 712 N.W.2d 540, 550 (Minn. 2006). We disagree.

Tate primarily relies on *Tran*, where the defendant was allowed to cross-examine officers about suspects who "should have been investigated more thoroughly." 712 N.W.2d at 550. But Tran's attempt to introduce one of the suspect's gang affiliation was rejected as an effort to "in essence bring[] alternative perpetrator evidence in through the back door." *Id*. at 552. Because there was not sufficient evidence to tie the suspect to the crime, Tran was not entitled to circumvent the alternative-perpetrator rule. *Id*.

Tate's assertion that evidence of the prior home invasion is "deeply relevant to whether Tate was the person who shot [D.R.] and J.B." is telling. He concedes that his purpose for admitting this evidence was to demonstrate that other people matched the description of the shooter and had a motive to commit the crime. In other words, Tate sought to offer alternative-perpetrator evidence under the guise of challenging law enforcement's investigation into alternative suspects. As in *Tran*, Tate's argument fails because there was not sufficient evidence to connect the other people to the shooting.

We note that the district court considered other evidentiary bases for admitting this evidence. The district court ruled that the prior home invasion could be referenced if "used to impeach [A.D.'s] intrinsic testimony," or "under 608(b) as a prior act of dishonesty." And at trial, Sgt. Voss was allowed to generally testify about events that occurred before the shooting, which showed A.D. had potential enemies even though she had previously

told Sgt. Voss that she was not "beefing" with anyone. On this record, we discern no abuse of discretion or resulting prejudice.

We also reject Tate's related argument that his attorney's failure to make a complete offer of proof regarding the prior home invasion constitutes ineffective assistance of counsel. Such claims require proof that counsel's representation fell below an objective standard of reasonableness and that, but for counsel's errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Carridine v. State*, 867 N.W.2d 488, 494 (Minn. 2015). A trial counsel's performance is presumed to be reasonable. *State v. Vang*, 847 N.W.2d 248, 266 (Minn. 2014). Tate acknowledges that the proffered evidence does not meet the alternative-perpetrator threshold. Accordingly, there is not a reasonable probability that the failure to make an offer of proof affected the outcome of the proceeding, and Tate did not receive ineffective assistance of counsel.

## II. Sufficient evidence supports Tate's convictions.

When considering a claim of insufficient evidence, our review is limited to an analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, is sufficient to allow the jury to reach the verdict that it did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). We must assume the jury believed the state's witnesses and disbelieved any evidence to the contrary. *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989) (*Moore I*). The verdict will not be disturbed if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a

reasonable doubt, could reasonably conclude the defendant was guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004).

To support a first-degree-assault conviction, the state must prove that the defendant assaulted another person and inflicted "great bodily harm." Minn. Stat. § 609.221, subd. 1 (2012). "Great bodily harm" is defined as "bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm." Minn. Stat. § 609.02, subd. 8 (2012). Whether an injury constitutes "great bodily harm" is a question for the jury. *State v. Moore*, 699 N.W.2d 733, 737 (Minn. 2005) (*Moore II*, unrelated to *Moore I*).

Tate argues that J.B.'s leg fracture is not great bodily harm because it falls under the definition of "substantial bodily harm." *See* Minn. Stat. § 609.02, subd. 7a (2012) (stating that "'[s]ubstantial bodily harm' means bodily injury . . . which causes a fracture of any bodily member"). We are not persuaded. The fact that a fracture may constitute substantial bodily harm does not preclude a particular fracture from meeting the definition of "great bodily harm." "Great bodily harm" includes the "protracted loss or impairment of the function of any bodily member." *Id.*, subd. 8. "Protracted" generally means drawn out, or lengthened in time. *The American Heritage Dictionary* 1417 (5th ed. 2011). J.B.'s fractured tibia required surgery and a splint to stabilize the bone. He was unable to walk and confined to a wheelchair during the summer months. Moreover, at the time of trial— almost nine months after the shooting—J.B.'s leg was still "crooked." A.D. testified that

8

if J.B. does not "grow into" the crooked leg, he will need additional surgery. This evidence establishes that J.B.'s injuries resulted in a protracted impairment of the function of his leg.

In a pro se brief, Tate asserts that D.R.'s injuries do not constitute "great bodily harm." We disagree. D.R. was shot in the lower back and thigh. At the time of trial, D.R. had scarring and numbness in his heel. He testified that he will "never walk the same" and cannot run like he used to because his left leg "give[s] out" on him. This evidence is sufficient to establish that D.R.'s leg function is permanently impaired. In sum, sufficient evidence establishes that Tate inflicted great bodily harm on both victims.

III.   **Admission of the doctor's testimony that a gunshot wound is a serious injury is not plain error.**

An expert may testify "in the form of an opinion or otherwise" if the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702. And an expert may testify on an ultimate issue if the testimony is helpful to the fact-finder. *Moore II*, 699 N.W.2d at 740. Expert opinion testimony is not helpful if its subject is within the knowledge and experience of a jury and the testimony will not add precision or depth to the jury's ability to reach a conclusion. *Id*. We have "not allowed ultimate conclusion testimony which embraces legal conclusions or terms of art." *Id*. (quotation omitted).

Tate contends that the district court plainly erred when it permitted Dr. Mark Ahrendt, a trauma surgeon who treated both D.R. and J.B., to testify that "a gunshot wound in and of itself is a serious injury unless it's just a graze." Because this testimony was not objected to at trial, we review for plain error. *State v. Ramey*, 721 N.W.2d 294, 297-99

9

(Minn. 2006). Tate must show (1) error, (2) that was plain, and (3) affected his substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). If those three elements are established, "we may correct the error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *State v. Strommen*, 648 N.W.2d 681, 686 (Minn. 2002) (quotations omitted).

Tate relies on *Moore II,* where a doctor testified that a victim's "injury met the legal definition of 'great bodily harm' because it satisfied the criterion of a 'protracted loss or impairment of the function of any bodily member.'" 699 N.W.2d at 736. The doctor explained that the loss of a tooth caused the victim to lose her ability to chew and use her lower mandible, and that in his opinion this constitutes "serious bodily injury." *Id*. The supreme court held that this testimony was not admissible because the doctor "did not just provide a medical explanation *in the context* of the legal definition; [the doctor] testified that the injury *met* the legal definition." *Id*. at 740. The testimony was not helpful to the jury—it simply told the jury which result to reach. *Id*.

Dr. Ahrendt's challenged acknowledgment that a gunshot wound is a "serious injury" does not present the same concerns. Although the phrase "serious bodily harm" appears in the statutory definition of "great bodily harm," neither the state nor Dr. Ahrendt referenced the statutory definition during this line of questioning. And at the point Dr. Ahrendt expressed this opinion, neither D.R.'s nor J.B.'s specific injuries had been described.[1] Rather, Dr. Ahrendt was offering a medical opinion about the general nature

---

[1] Dr. Ahrendt later testified about the injuries sustained by D.R. and J.B., but did not state that the specific injuries satisfied the statutory definitions.

10

of gun-related injuries. On this record, we conclude that the district court did not plainly err by failing to sua sponte preclude this testimony.

**IV.    The prosecutor did not commit misconduct.**

Tate argues for the first time on appeal that he is entitled to a new trial because the prosecutor improperly aligned herself with the jury by stating that A.D. and D.R. were from a different world than the prosecutor and the jury and vouched for W.R.'s credibility.[2]

We look at the trial as a whole to determine whether prosecutorial misconduct warrants a new trial. *See State v. Johnson*, 616 N.W.2d 720, 727-28 (Minn. 2000) (stating when courts consider claims of prosecutorial misconduct in closing argument the arguments are considered as a whole); *see also State v. Hoppe*, 641 N.W.2d 315, 321-22 (Minn. App. 2002) (holding that a new trial was warranted after looking at all instances of prosecutorial misconduct taken together), *review denied* (Minn. May 14, 2002). We review unobjected-to prosecutorial misconduct under a modified plain-error standard, under which the state bears the burden of proving that the misconduct did not affect the defendant's substantial rights. *Ramey*, 721 N.W.2d at 302 (stating that the state must prove there is no reasonable likelihood that the absence of the misconduct would have significantly affected the jury's verdict).

---

[2] Tate also argues that the prosecutor committed misconduct by communicating "impressions by innuendo" during Sgt. Voss's testimony about the surveillance video. An impression by innuendo occurs when a prosecutor indirectly refers to evidence that is otherwise inadmissible. *State v. Currie*, 267 Minn. 294, 301, 126 N.W.2d 389, 395 (1964). Our review of the record persuades us that no such innuendo occurred here.

Tate cites *State v. Mayhorn*, 720 N.W.2d 776 (Minn. 2006) and *State v. Ray*, 659 N.W.2d 736 (Minn. 2003) for the proposition that the prosecutor improperly aligned herself with the jury. In *Mayhorn*, the prosecutor highlighted cultural differences between the defendant and the predominantly white jury, including referring to a "drug world" that she and the jury were not "accustomed to." 720 N.W.2d at 789. The supreme court acknowledged that it was not misconduct for a prosecutor to describe a defendant as not being from the same world as the jurors to "prepare the jury for evidence of an unfamiliar world involving drugs." *Id*. (quotation omitted). But the court held that it was misconduct "to highlight the defendant's racial or socioeconomic status as a way to put evidence in context," and using the terms "'we' and 'us' is inappropriate and may be an effort to appeal to the jury's passions." *Id*. at 789-90.

Likewise, *Ray* involved a prosecutor's effort to contrast the worlds of the defendant and the jurors. During closing argument, the prosecutor noted that the charged crime did not involve a dispute between businessmen from Edina or Minnetonka, but instead was a dispute involving "three young black males in the hood in North Minneapolis." 659 N.W.2d at 746. The supreme court concluded that the prosecutor's invitation to the jury to consider how the defendant's racial and socioeconomic status differed from their own effectively denied the defendant a fair trial. *Id*. at 747.

*Ray* and *Mayhorn* stand for the proposition that it is improper for a prosecutor to make reference to a different world or environment to distinguish the defendant's racial or socioeconomic status from those of the jurors. No such conduct occurred here. The prosecutor's arguments did not point out differences between the jury and Tate; they

focused on witnesses A.D. and D.R.  When the prosecutor's closing argument is viewed as a whole, it is clear that references to the world that A.D. and D.R. live in were offered to explain why they did not initially cooperate with law enforcement and identify Tate as the shooter.  The state's case relied heavily on the credibility of these witnesses.  And "[w]hile a prosecutor must not personally endorse a witness's credibility, the [s]tate may . . . argue that a witness was or was not credible." *State v. Martin*, 773 N.W.2d 89, 106 (Minn. 2009). By referencing a world where police are mistrusted, the prosecutor sought to bolster the credibility of A.D. and D.R. by explaining why their statements to law enforcement evolved during the investigation.

Tate next argues that the prosecutor improperly vouched for W.R.'s credibility, pointing to the closing arguments that "[W.R.]'s not pulling any punches," "[W.R.]'s not trying to lie about anything or make himself look any better," and "W.R. is a pretty darn good witness, and he was pretty candid with you and pretty straightforward."  Improper vouching "occurs when the [state] implies a guarantee of a witness's truthfulness, refers to facts outside the record, or expresses a personal opinion as to a witness's credibility." *State v. Lopez-Rios*, 669 N.W.2d 603, 614 (Minn. 2003) (quotation omitted).  But "the state is free to argue that particular witnesses were or were not credible."  *State v. Fields*, 730 N.W.2d 777, 785 (Minn. 2007).  That is what happened here.  The prosecutor made the challenged statements in the context of W.R.'s credibility and in reference to facts suggesting why the jury should believe him.  This does not amount to improper vouching.

**V.** **The district court did not abuse its discretion by imposing an upward departure and consecutive sentences.**

A district court must sentence a defendant within the guidelines range "unless there exist identifiable, substantial, and compelling circumstances to support a sentence outside the appropriate range on the applicable [g]rid." Minn. Sent. Guidelines 2.D.1 (2012). "Substantial and compelling circumstances are those demonstrating that the defendant's conduct in the offense of conviction was significantly more or less serious than that typically involved in the commission of the crime in question." *State v. Hicks*, 864 N.W.2d 153, 157 (Minn. 2015) (quotations omitted). We review a district court's decision to depart from the sentencing guidelines for an abuse of discretion. *Id*. at 156. If the reasons "for an upward departure are legally permissible and factually supported by the record, the departure will be affirmed." *Id*. (quotation omitted).

Aggravating factors for upward departures include situations where "the victim was particularly vulnerable due to age, infirmity, or reduced physical or mental capacity, which was known or should have been known to the offender." Minn. Stat. § 244.10, subd. 5a(a)(1) (2012). A single aggravating factor is sufficient to justify an upward departure. *Dillon v. State*, 781 N.W.2d 588, 599 (Minn. App. 2010), *review denied* (Minn. July 20, 2010). Although "[t]he statutory maximum sentence is the absolute ceiling on the district court's sentencing discretion," a court generally should not impose a sentence more than twice the presumptive term. *Id*. at 596.

Tate was sentenced to 206 months—a double upward departure from the presumptive sentence—for the first-degree assault involving J.B. The departure was

14

grounded on the facts, which the jury found beyond a reasonable doubt, that J.B. was four years old and confined in the back seat of a closed vehicle at the time of the offense. These facts establish that J.B. was particularly vulnerable due to his age. Because this departure ground is legally permissible and factually supported by the record, the district court did not abuse its discretion by imposing a double upward departure.

Tate next argues that the district court unduly exaggerated the criminality of his conduct by imposing a 103-month consecutive sentence for the first-degree assault on D.R. Minn. Stat. § 609.035 (2012) prohibits multiple sentences for two or more offenses committed as part of a single behavioral incident. *State v. Ferguson*, 808 N.W.2d 586, 589 (Minn. 2012) (*Ferguson II*, unrelated to *Ferguson I*). But "defendants may be sentenced separately for multiple convictions arising from the same behavioral incident if those convictions relate to multiple victims." *State v. Edwards*, 774 N.W.2d 596, 605 (Minn. 2009). The purpose of the multiple-victim exception is to make sure a "defendant's punishment will be commensurate with his criminal liability and a defendant who commits an act of violence with the intent to harm more than one person or by means likely to cause harm to several persons is more culpable than a defendant who harms only one person." *Id*. (quotations omitted). But the multiple sentences must not "unfairly exaggerate the criminality of the defendant's conduct." *Ferguson II*, 808 N.W.2d at 590. A district court's decision to impose a consecutive sentence will not be reversed unless there has been a clear abuse of discretion. *Vang*, 847 N.W.2d at 264.

Because Tate's criminal conduct involved two victims, the district court had a legal basis to impose consecutive sentences. The only issue is whether doing so exaggerates the

criminality of Tate's acts.  We conclude it does not.  When imposing the consecutive sentence for the assault of D.R., the district court noted that it was not departing upward because the impact of the aggravating factor—the presence of children—was "wound into" the sentence for the other conviction.  The court noted that departing upward on the second offense would "exaggerate the criminality of the conduct," but that not sentencing "consecutively in a case like this would diminish the significance . . . of what [Tate] did."

Finally, Tate argues that the shooting of J.B. was accidental.  But he provides no authority that this reduces the criminality of his actions or otherwise negates the court's ability to impose consecutive sentences.  Tate cites *State v. Goulette*, 442 N.W.2d 793, 795 (Minn. 1989) and *State v. Norris*, 428 N.W.2d 61, 71 (Minn. 1988) to show that this court is authorized to reduce a sentence that unfairly exaggerates the criminality of the defendant's conduct.  We agree but discern no factual basis for reducing Tate's sentence.  Neither *Goulette* (five consecutive sentences imposed for five aggravated-robbery convictions) nor *Norris* (life sentence for first-degree murder and five consecutive sentences for five second-degree-assault convictions) are comparable to the present case and do not establish why Tate's sentence should be reduced.  Because the district court carefully considered the impact of its sentencing decisions and there is no legal authority that suggests consecutive sentences in this situation exaggerate the criminality of Tate's conduct, we discern no abuse of discretion.

**Affirmed.**